**UNITED STATES of America**

**v.**

**Frederick SCHIAVO.**

Appeal of PHILADELPHIA NEWSPA-
PERS, INC., and Susan Q.
Stranahan.

PHILADELPHIA NEWSPAPERS, INC.,
and Susan Q. Stranahan,
Petitioners,

**v.**

UNITED STATES of America and Fred-
erick Schiavo, Respondents,

and

The Honorable J. William Ditter, Jr.,
Nominal Respondents.

Nos. 73-1855, 73-1856.

United States Court of Appeals,
Third Circuit.

Argued Dec. 19, 1973.

Reargued En Banc May 15, 1974.

Decided Aug. 8, 1974.

As Amended Aug. 22, 23, and
Oct. 23, 1974.

Certiorari Denied Dec. 23, 1974.
See 95 S.Ct. 690.

Adams, Circuit Judge, filed special-
ly concurring opinion in which Gibbons
and Garth, Circuit Judges, joined.

Aldisert, Circuit Judge, dissented
and filed opinion in which Weis, Circuit
Judge, joined.

See also D.C., 375 F.Supp. 475.

Harold E. Kohn, David H. Marion, and Samuel E. Klein, of Harold E. Kohn, P.A., Philadelphia, Pa., for appellants in No. 73–1855 and for petitioners in No. 73–1856.

Robert E. J. Curran, U. S. Atty., J. Clayton Undercofler, III, First Asst. U. S. Atty. and Walter S. Batty, Jr., Chief, Appellate Section, Philadelphia, Pa., for respondent United States and for the nominal respondent.

Arthur B. Hanson, and Ralph N. Albright, Jr., Washington, D. C., for American Newspaper Publishers Ass'n, amicus curiae.

James C. Goodale, and Alexander Greenfeld, New York City, for New York Times Co., amicus curiae.

Argued Dec. 19, 1973.

Before VAN DUSEN, ALDISERT and ROSENN, Circuit Judges.

Reargued May 15, 1974.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Philadelphia Newspapers, Inc. (hereinafter the "Philadelphia Inquirer") and Susan Q. Stranahan, appellants in No. 73–1855 and petitioners in No. 73–1856, seek reversal of a written and docketed district court order refusing to vacate an oral order, announced from the bench, enjoining them and other news media representatives from publishing,

during the perjury trial of Frederick Schiavo, information concerning murder and conspiracy indictments pending against Schiavo in a related matter.[1]

Schiavo's perjury trial arose out of the death of Martin Alan Hess, a Government informer scheduled to testify in narcotics and counterfeit cases, who was killed in August 1972 when a bomb which had been placed in his car exploded. Schiavo's perjury indictment charged that he had lied to a federal grand jury which was investigating Hess' death. In addition to being indicted for perjury, Schiavo was indicted by a federal grand jury in the Eastern District of Pennsylvania on charges of conspiracy in connection with the alleged murder of the informer and by the State of New Jersey on charges of first degree murder.

Schiavo's perjury trial commenced on Wednesday, October 3, 1973. In an article appearing on Thursday, October 4, under the by-line of appellant Stranahan, the Philadelphia Inquirer reported the events of the first day of trial. The article also indicated that the defendant was "one of five men charged with conspiring to kill a government informer last August." On Thursday afternoon, fearing that the jury in Schiavo's trial might read the article and learn of the other indictments, the district judge summoned members of the press, including appellant Stranahan, to sidebar and stated that, while he could not tell the press what to publish, he hoped that they would appreciate the problems involved in mentioning the other two indictments.[2] On Friday, October 5, again under the by-line of appellant Stranahan, the Philadelphia Inquirer published an account of Thursday's proceedings and, in apparent disregard of the district court's request, referred to the existence of the two other indictments. The article stated that "Schiavo also is charged by the Federal government with conspiring to kill Hess and with first-degree murder in New Jersey." On Friday afternoon, at approximately 2:00 P.M., the district judge called the news media representatives covering the trial before him, stated that "they could print that which went on in the court room," but orally ordered them not to mention the above-mentioned two other indictments for different offenses in any further stories, and specifically stated that appellant Stranahan and the editors of the Philadelphia Inquirer would face contempt charges if they violated this order.[3] This order

---

1. In their petition for a writ of mandamus and/or prohibition in No. 73–1856, petitioners advance the same arguments and grounds for relief as in their appeal in No. 73–1855. Because our disposition of the appeal in No. 73–1855 renders the petition for a writ of mandamus and/or prohibition moot, such petition will be denied at No. 73–1856. *Cf.* State ex rel. Miami Herald v. Rose, 271 So. 2d 483 (Fla.Ct.App.1972).

2. See N.T. 2–17 to 2–18. The record indicates that the district judge stated the following to the press reporters:

"Lady and gentlemen, the defendant in this case is charged with perjury. There is an article in this morning's Inquirer which points out that he was also charged with another crime.

"I would ask you, please, that if you feel that you must write about this case, write about this case and not about other cases. It makes it most difficult to carry on a criminal trial if this sort of thing happens, and I would ask each of you, please, to try to be aware of the problem with the Court and criminal defendants.

"I know I can't tell you what to write, but I would hope that you would be aware of the problems that you create, at least.

"All right, thank you very much."

Defense counsel (Mr. Madnick) had requested the court Thursday morning to tell the press "not to make reference to the fact . . . that Mr. Schiavo has also been indicted in another matter" (N.T. 2–17). A similar request was made on Friday morning (N.T. 3–17ff.).

3. *See* N.T. 3–61 to 3–62. The record indicates that the district judge stated the following (Doc. 20 in E.D.Pa.Crim. # 73–302):

"(At side bar the following ensued with the following parties present:

"Richard Meltzer, Esquire; Irving Madnick, Esquire; Edward Polinski, Deputy Clerk; Mr. Rosenthal, U.P.I.; Mr. Enoch, Daily News; Miss Stranahan, Inquirer; Mr. Messaros, Bulletin and Mr. Guadiosi, U.P.I.)

was not transcribed that week; also, it was neither set forth in writing by the district court nor entered on the district court docket until after the appeal was docketed in this court. The first evidence on the district court docket of the reduction of the district court order to writing is a docket entry on October 10, 1973.[4]

At approximately 4:00 P.M. the same afternoon (October 5), counsel for appellants appeared before the district court and presented argument in support of a written motion that the above oral order be vacated. After hearing argument,[5] the district court denied the motion to vacate and subsequently denied a motion for a stay of the order pending appeal. This order refusing to vacate the prior oral order was set forth in writing and entered on the district

court docket. The appellants immediately filed a notice of appeal late Friday afternoon, October 5, from the 4 P.M. order refusing to vacate the oral order announced about 2 P.M.

In their appeal, the appellants challenge the order of the district court on both constitutional and procedural grounds. For reasons which appear below, we reverse the district court order on procedural grounds.

I.

This appeal confronts this court with two preliminary issues.

First, appellee[6] contends that there is no appealable order in the instant case. Specifically, the appellee contends that the district court's oral silence order is not an injunction within the meaning of 28 U.S.C. § 1292(a)(1)

---

"(Discussion was had off the record.)
"THE COURT: While we were off the record I had the members of the press to come into the courtroom and they have all come in, at least so far as I know, and that would be Miss Stranahan, and I don't know your name.
"MR. ROSENTHAL: Mr. Rosenthal.
"THE COURT: Which paper?
"MR. ROSENTHAL: The Associated Press.
"MR. ENOCH: Danny Enoch, Associated Press, Judge.
"MR. GUADIOSI: John Guadiosi, United Press International.
"THE COURT: Miss Stranahan, of the Inquirer and Mr. Henry Messaros from the Bulletin. I told them all that while they could print that which went on in the courtroom so far as this trial is concerned they were not to write nor were their papers to print matters that were not said here in the courtroom.
"MR. MADNICK: Specifically, I think Your Honor should—
"THE COURT: And specifically I told Miss Stranahan that she had in a story byline that had been pointed out that this defendant had been indicted in New Jersey and had been indicted for other offenses in this jurisdiction. I said that there was to be no repetition of that story or those facts and that if it was repeated I would consider it a matter of contempt of court and I would consider holding her liable for contempt and holding her editors liable for contempt.

"MR. ENOCH: Would you agree that without the known connection between Mr. Schiavo and the Hess murder this trial seems to be very little without the—
"THE COURT: I didn't say anything about your not printing that which is said here in the courtroom. I'm talking about information that has not come out in the course of the trial and there have been many references to Martin Alan Hess in the course of this trial.
"MR. ENOCH: How about information we can find in our libraries at the different papers?
"THE COURT: If it hasn't come out here in this courtroom I would consider that contempt.
"Anything you want me to add, Mr. Madnick?
"MR. MADNICK: No, sir.
"(Side bar concluded.)"

4. It is noted that this transcript (Document 12, filed October 10) contains the oral statement in open court of the district judge at 2 P.M., setting forth his oral order, which was also transcribed again in the transcript filed November 6. See note 3. (Document 20, filed 11/6/73 in E.D.Pa., Crim. No. 73–302).

5. See N.T. 3–13 of Document 12 in E.D.Pa. Criminal No. 73–302.

6. Appellee herein designates the United States. Schiavo filed no brief and took no part in this appeal.

but merely an incidental court order which is non-appealable, notwithstanding the fact that it purports to enjoin publication by the newspapers of certain information. We find it unnecessary to resolve this issue as we have concluded that the written order of October 5, 1973, is an appealable final order under 28 U.S.C. § 1291, since it falls within the "collateral order" doctrine established by the Supreme Court in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). In *Cohen*, the Supreme Court defined collateral orders as

> "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. . . . We hold this order appealable because it is a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it."

337 U.S. at 546–547, 69 S.Ct. at 1226. The order in the instant case constituted a final decision since it determined a matter independent of the issues to be resolved in the criminal proceeding itself, bound persons who were non-parties in the underlying criminal proceeding and had a substantial, continuing effect on important rights.[7]

▮ Secondly, the appellee contends that the instant appeal should be dismissed as moot since Schiavo's criminal trial has been completed and there no longer exists any restraint upon the appellants. We reject this contention and hold that this case is reviewable as a dispute "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); see also DeFunis v. Odegaard, 416 U.S. 312, 318, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974); Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). This conclusion is not affected by the possibility that appellants may be cited for contempt of the silence order. The publication of proscribed matters in violation of the order would constitute a criminal contempt, and the merits of such an order could not ordinarily be challenged on appeal from a citation for criminal contempt. See United States v. United Mine Workers, 330 U.S. 258, 289–295, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Walker v. Birmingham, 388 U.S. 307, 314–320, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).[8] If this case were deemed moot, it is unlikely that members of the press who are subject to a silence order would ever be able to obtain appellate review, since the underlying criminal proceeding would almost always terminate before the appellate court hears the case.

## II.

Appellants advance numerous arguments in support of their contention that the district court erred in refusing to vacate the silence order. Before reaching those arguments, however, we must address one problem not noted by appellants.

7. See Rendleman, Free Press—Fair Trial; Review of Silence Orders, 52 N.C.Law Rev. 127, 128–30 (1973).

8. We note that while the merits of the allegedly violated order would ordinarily not be reviewable on appeal of a criminal contempt, the breadth and vagueness of the order would be open to question. *See* Walker v. Birmingham, 388 U.S. 307, 317, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). Appellants' challenge to the order here, however, is not limited to its asserted ambiguity. Also, on this record, which does not contain any evidence of the alleged contempt occurring after October 5, it is not appropriate to consider whether the rule of these cases should be applied in this situation, where the representatives of the press have filed a motion to vacate the oral silence order and an immediate appeal from the denial of such motion. By contrast, the Supreme Court pointed out in *Walker* that no effort was made to modify or dissolve the enjoining order. *Id.* at 318, 87 S.Ct. 1824.

**6**

■ We assume for purposes of this appeal that the district court had power to enter the silence order, even though that order directly bound non-parties and governed their actions outside the presence of the court. The Sixth Amendment imposes a duty on the district courts no less than on prosecutors to take reasonable measures to ensure defendants fair trials, free of prejudice and disruption. See Sheppard v. Maxwell, 384 U.S. 333, 361–363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Certainly, a federal trial judge may, to that end, restrict the actions of non-parties in his presence. See United States ex rel. Robson v. Malone, 412 F.2d 848 (7th Cir. 1969); United States v. Venuto, 182 F. 2d 519 (3d Cir. 1950). In fulfilling their charge, the district courts also are authorized to restrict conduct outside the courtroom of parties, lawyers, jurors, witnesses, court officials and others connected with the trial process. Sheppard v. Maxwell, *supra* at 361–362, 86 S.Ct. 1507. This nucleus of clear judicial power to assure defendants fair trials underlies our assumption that the court below possessed the power to prohibit non-parties from taking actions, out of court, that would imperil efforts to provide Schiavo a fair trial.[9] This assumption does not pre-judge the possible constitutional limits on the exercise of such a power.[10]

■ Appellants' most vigorously pressed contention is that the district

court's refusal to vacate the silence order was error because entry of the silence order against newspapers and reporters contravened the First Amendment guarantee of freedom of the press from governmental restraint. Appellants also argue that the district court's initial order should have been vacated because it was entered without according them appropriate procedural safeguards.

We have concluded that the district court's written order of October 5, refusing to vacate the previous oral order, should be reversed since the previous oral order was procedurally deficient in various important respects. Our conclusion that this case should be reversed on procedural grounds makes resolution of the constitutional issue unnecessary. See Alma Motor Co. v. Timken-Detroit Axle Co., 329 U.S. 129, 136–137, 67 S.Ct. 231, 234, 91 L.Ed. 128 (1947). In *Alma Motor Co., supra,* the Supreme Court stated:

"If two questions are raised, one of non-constitutional and the other of constitutional nature, and a decision of the non-constitutional question would make unnecessary a decision of the constitutional question, the former will be decided. This same rule should guide the lower courts as well as this one. We believe that the structure of the problems before the

---

9. The plurality opinion in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L. Ed.2d 626 (1972), also assumes that courts possess this power and, further, intimates a resolution of the constitutional question we avoid here: what action may the district court take to carry out its duty under the Sixth Amendment without violating First Amendment limitations on its actions? The plurality in *Branzburg* declared:

"Newsmen . . . may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal."

*Id.* at 684–685, 92 S.Ct. at 2658. We do not attempt to foresee whether the Court will adhere to this dictum in the future.

10. In view of the jurisdiction granted to the district courts over "all offenses against the laws of the United States" in 18 U.S.C. § 3231 and the requirements of the Sixth Amendment, it is unnecessary to consider whether the terms of 28 U.S.C. § 1651(a) authorize the district court in a criminal case to issue such an essentially injunctive order affecting persons who are not parties in aid of its criminal jurisdiction. *Cf.* United States v. Morgan, 346 U.S. 502, 506–513, 74 S.Ct. 247, 98 L.Ed. 248 (1954); 9 Moore's Federal Practice (2d ed.) § 110.29; United States v. Steese, 144 F.2d 439, 442, 445–447 (3d Cir. 1944); United States v. Lynch, 132 F.2d 111, 113 (3d Cir. 1943).

Circuit Court of Appeals required the application of the rule to this case." [11]

This case came before us in an unusual procedural posture. The oral silence order which was entered at 2 P.M. on October 5, 1973, and which is being challenged on this appeal was never reduced by the district judge to written form, stating in specific terms exactly what conduct on the part of the press was being restrained and for what reasons such conduct was being restrained, nor was it entered on the district court docket in the criminal proceeding against Schiavo. In addition, no part of the official transcript relating to the oral order was filed until October 10, 1973,[12] and the transcript of the actual silence order itself was not completed and filed until November 6. Therefore, as of the time that the notice of appeal was filed in this court on Friday, October 5, there was no written version of the silence order, either in the form of a written order on a separate document or in the form of a transcript of the proceedings, which this court could consider in resolving the appeal. The sole written record which was either presented to or available for this court's consideration was the written order refusing to vacate the prior oral order. This written order, consisting of one sentence, gave no indication of the substance of the previous oral order or of the reasons for its issuance.

In addition to the above, the silence order was not simply an interlocutory order binding persons already parties to the criminal proceeding and already properly before the court. Rather, the silence order was directed at non-parties, who were brought before the court solely because of the court's desire to prevent outside interference with the trial. As such, the silence order was a final decision in a collateral matter against non-parties, with a continuing binding effect against such persons which would last indefinitely. Because of the application to revoke the oral order, it could be expected that the persons bound by that order would seek immediate appellate review since they faced the threat of criminal contempt charges if they disobeyed such order.

In light of the above factors, we have concluded, pursuant to our supervisory powers,[13] that the oral silence order was procedurally deficient. Where a district court enters such an order which is immediately appealable as a final decision in a collateral matter, and where such order binds non-parties for a continuing period of time, the order should be reduced to written form, stating specifically the terms of the order and the reasons therefor, and entered on the district court docket.[14] Accordingly, we

11. See also Ashwander v. Valley Authority, 297 U.S. 288, 345–348, 56 S.Ct. 466, 80 L. Ed. 688 (1936) (concurring opinion of Brandeis, J.); United States v. United States District Court, 407 U.S. 297, 340; 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (concurring opinion of White, J.); Zschernig v. Miller, 389 U.S. 429, 444–445, 88 S.Ct. 664, 19 L. Ed.2d 683 (1968) (concurring opinion of Harlan, J.). In his concurring opinion in *Ashwander*, Justice Brandeis stated that "the Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." 297 U.S. at 347, 56 S.Ct. at 483. See also Rescue Army v. Municipal Court, 331 U.S. 549, 568–569, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

12. See note 4, *supra*.

13. McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 87 L.Ed. 819 (1942); Bartone v. United States, 375 U.S. 52, 54, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963); Government of the Virgin Islands v. Bodle, 427 F.2d 532, 534 (3d Cir. 1970); *cf.* LaBuy v. Howes Leather Co., 352 U.S. 249, 259–260, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957); United States v. Barber, 442 F.2d 517, 528 (3d Cir. 1971); United States v. Fioravanti, 412 F. 2d 407, 420 (3d Cir. 1969).

14. *Cf.* Levin v. Wear-Ever Aluminum, Inc., 427 F.2d 847, 848–849 (3d Cir. 1970). Although the Federal Rules of Civil Procedure (see note 16 below) are inapplicable to the criminal proceeding being tried on October 5, 1973, we note that Rule 55 of the Federal Rules of Criminal Procedure provides that "each order or judgment of the court" shall be entered in the criminal docket. As stated

hold that the written order of October 5, 1973, must be reversed. The district court should have vacated the oral order, held a prompt hearing after notice to the involved members of the press and parties, and, if a silence order was deemed to be justified, reduced such order to writing with specific terms and reasons and had it entered on the district court docket.[15]

The above procedural requirements, which we impose under our supervisory power, are particularly necessary in a case such as the instant case, where the district court order affects the First Amendment rights of the press. First, the district court's failure to reduce the order to writing subjected the First Amendment rights of the press to an impermissible "chilling effect." The appellants could act only at their own risk since they were subject to the threat of criminal contempt for failure to comply with the order, and such risk was necessarily increased by the fact that the appellants had no written version of the order detailing precisely what conduct was prohibited. Second, the fact that the order involved the balancing of fundamental constitutional rights made it even more imperative that this court, in reviewing the merits of the order, have before it a written order providing specifically what conduct was restrained and for what reasons.

█ Finally, we note that the procedural requirements which we impose under our supervisory powers for this type of proceeding [16] are similar to those imposed by the Federal Rules of Civil Procedure. *Cf.* F.R.Civ.P. 54, 58, 65(d), and 79(a).[17]

For the foregoing reasons, the district court written order of October 5, 1973,

---

in note 4 above, the transcript of the oral order was not filed until November 6, 1973, and there was no notation on the docket of the entry of an order even on that date.

15. Notice of such a hearing, with a warning to the press representatives to secure counsel, to be held at the termination of the jury trial on the afternoon of October 5 could have been given at or prior to 2 P.M., when the silence order was orally stated, or at least when the motion to vacate such oral order was presented at 4 P.M. on that day. In view of the conflicting policies of the First and Sixth Amendments (see pages 5–7 above) and repeated holdings that restraints of the press may only be granted in unusual circumstances, such hearings are most important so that the district court can weigh all the circumstances of the particular case in light of the applicable constitutional policies. The district court should solicit the comments of all counsel on the proposed wording of any proposed silence order.

16. A silence order of this type has been described as " . . . a civil order in a criminal case . . . ." *Rendleman, supra* at 131.

17. F.R.Civ.P. 54 provides that a " 'judgment' as used in these rules includes a decree and any order from which an appeal lies." F.R.Civ.P. 58 provides that "every judgment shall be set forth on a separate document" and that "a judgment is effective only when so set forth and when entered as provided in Rule 79(a)." F.R.Civ.P. 79(a) prescribes the procedure for entry of judgment on the district court docket. That these procedural requirements must be strictly complied with was recently reaffirmed by the Supreme Court in United States v. Indrelunas, 411 U.S. 216, 220–221, 93 S.Ct. 1562, 36 L.Ed.2d 202 (1973). It has also been the consistent policy of this court that a judgment, to be effective, must both be on a separate document as required by F.R.Civ.P. 58 and be docketed as provided in F.R.Civ.P. 79(a). See Levin v. Wear-Ever Aluminum, Inc., 427 F.2d 847, 848–849 (3d Cir. 1970) ; Jenkins v. United States, 325 F.2d 942, 944 n.6 (3d Cir. 1963). Even prior to the 1963 amendment of Rule 58, requiring judgments "on a separate document," failure to have a written indication in the record on the docket of a civil judgment made it ineffective. See *Jenkins, supra* at 944–945.

In addition to the above requirements, F.R. Civ.P. 65(d) states that "every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in its terms; [and] shall describe in reasonable detail the act or acts sought to be restrained." Although we do not hold in this case that a silence order is an injunction within the meaning of F.R. Civ.P. 65(d), nevertheless Rule 65(d) reflects the clear policy that parties bound by restraining orders should be informed exactly what conduct is sought to be restrained.

will be reversed and the case remanded for such action as may be necessary, consistent with this opinion.

ADAMS, Circuit Judge (concurring):

The procedural and constitutional issues raised by the district court's refusal to vacate its oral order restraining the publication in newspapers of certain background material concerning Schiavo do not readily lend themselves to precise formulation. Moreover, even though a satisfactory formulation may appear to be achieved, reasoned explanations for alternative definitions of a number of the issues exist. It is not surprising, therefore, that while I concur with the plurality's conclusions on several points—for example, those concerning appealability [1]—its opinion does not reflect my own perceptions of the problems presented by this appeal in several major respects.[1a]

Thus, although agreeing that the appeal in this case is not moot, I attach somewhat greater significance than does the plurality to the representation made to this Court by the United States Attorney that the district court intends to conduct proceedings with the view to holding any person, subject to the order, who violated it, in contempt.[2] This representation renders the mootness question substantially more analytically difficult than the brevity of the plurality's discussion might suggest. Specifically, it would appear necessary to consider the effect of a determination that this appeal is not moot on an attempt by an alleged contemnor to attack the merits of the

district court's order should a contempt proceeding take place.

Also, the plurality's characterization of the grounds for the reversal of the district court's order as "procedural" seems too facile. If the order is to fall because of the absence of procedural safeguards prior to its issuance, such safeguards are dictated in this case by the First Amendment values implicated. I would not invoke our supervisory powers, assuming such powers may be invoked in the context of the dispute presented here, to require the district courts to follow certain procedures when case law so clearly compels such a result in any event.

Further, the order in this case, in my judgment, may be questioned on the settled constitutional ground that it fails to achieve the precision that any restriction on speech or press must possess in order to comport with the First Amendment.

I.

The district court's oral order sought to limit publication of potentially prejudicial material during the pendency of Schiavo's trial. By the time this Court was prepared to deal with the appeal from the order, the trial had concluded. Thus, since there no longer existed any reason to limit the publication of the matters arguably covered by the oral order, the Government asserts that the appeal is now moot.

The plurality "reject[s] this contention and hold[s] that this case is reviewable as a dispute 'capable of repetition, yet evading review.' "[3] With this

---

1. *Cf.* United States v. Nixon, 418 U.S. 683, 690–692, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (U.S. July 24, 1974).

1a. Possible sources of district court power to issue orders affecting the conduct of nonparties, such as news reporters or their publishers, so as to assure fair and orderly progress of criminal trials received only brief attention at oral argument and in the Government's briefs. Further, my own research does not conclusively establish that the All-Writs statute, 28 U.S.C. § 1651, bestows such authority on the district courts.

Because this issue has been but slightly exposed on this appeal, I am not prepared to address it even though, in my view, the case then must be decided on grounds that might be regarded, at least, as quasi-constitutional.

2. Although it is generally preferable to confine appellate adjudication to the record, here the Court has been advised, without contradiction, that the district court has already issued a notice summoning the parties to a hearing to determine whether there has been a contempt.

3. Majority Opinion at 5.

decision, I agree. However, although the plurality suggests that an alleged contemnor may be able to secure review of the merits of a silence order at a contempt proceeding, the question is far from settled and in rejecting the appellee's mootness contention, it may be suggested that we implicitly disparage the possibility of any review of the merits of silence orders at the contempt stage.[4]

To discount the possibility of challenging an order in a contempt proceeding appears to be consistent with the Supreme Court's decisions in United States v. United Mine Workers[5] and Walker v. Birmingham.[6] "Violations of an order are punishable as criminal contempt even though the order is set aside on appeal."[7] Nonetheless, I, apparently like the plurality, am not confident that a silence order like the one here is completely immune from collateral attack in a contempt proceeding. Clearly, the question whether collateral attack on the merits of a silence order is available cannot be definitively resolved in this case, for we are not reviewing an attempt to attack an order collaterally in a contempt proceeding. But it appears appropriate to adumbrate considerations that may remove silence orders, at least in some instances, from what may seem to some to be the precedential ambit of United Mine Workers, and Walker.

In Walker, the Supreme Court stated that "[the] case would arise in quite a different constitutional posture if the petitioners, before disobeying the injunction, had challenged it in the Alabama courts, and had been met with delay or frustration of their constitutional claims."[8] It has been suggested, not unreasonably, that the Supreme Court thus "qualified the application of the collateral bar rule by requiring that adequate and effective remedies for review be present before the rule can be properly invoked."[9] Adopting such a precept, it can be argued that "adequate and effective" appellate remedies are frequently lacking when silence orders are issued during the course of a criminal case.[10]

The facts of this case offer an illustrative situation. The district court issued its oral order at 2:00 P.M. on Friday afternoon and denied the motion to vacate about two hours later. Representatives of the media immediately filed notice of appeal. Both in the district court and here they moved for a stay. The district court denied the request and this Court did not grant a stay until the following Wednesday, five days later. On that same day, the jury returned its verdict. Hence, by the time the strictures of the district court's order were lifted the information covered by the order had, for all practical purposes, lost its timeliness. This, of course, is particularly unfortunate in light of the subsequent determination, on this appeal, that the order was, in fact, invalid.

In a sense, therefore, the representatives of the media were deprived of "adequate and effective" review. De-

---

4. The plurality does state that "[i]f this case were deemed moot, it is unlikely that members of the press who are subject to a silence order would ever be able to obtain appellate review, since the underlying criminal proceeding would almost always terminate before the appellate court hears the case." Plurality Opinion at 5.

5. 330 U.S. 238, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

6. 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

7. 330 U.S. at 294, 67 S.Ct. at 696.

8. 388 U.S. at 318, 87 S.Ct. at 1831.

9. Rendleman, Free Press—Fair Trial: Review of Silence Orders, 52 N.C.L.Rev. 127, 149.

10. For example, counsel for two Louisiana papers were forced to fly hurriedly to Washington to request the Supreme Court to grant a temporary restraining order enjoining a state judge's wide-ranging "gag order" pending the disposition of the newspapers' appeal. N.Y. Times, July 15, 1974 at 9. Absent the Supreme Court's grant of the newspapers' extraordinary request, the gag order will probably remain in effect until the trial ends because, in all likelihood, appellate review will not be available until after the trial's completion.

spite vigorous pursuit of their appeal and prompt action by this Court, they were unable to press their objections to the order until the practical effect of success on appeal, at least in this case, had become insubstantial. To put litigants in appellants' position to the choice of obeying an order and awaiting appellate action while their alleged civil rights continue to be infringed, or of disobeying the order and then facing certain contempt convictions, makes any subsequent victory on appeal Pyrrhic indeed. Assuming proper and good faith pursuit of appellate remedies, the *Walker* dicta may well provide an avenue of escape from this dilemma by permitting collateral attack of the order in a contempt proceeding. The accused contemnor, of course, would continue to assume the risk that the order is valid and, hence, his disobedience inexcusable.

However, in United States v. Dickinson, [11] an appeal from a judgment of contempt in circumstances similar to those here, the Fifth Circuit considered this rationale for justifying a reversal of a contempt conviction and concluded it was outweighed by competing considerations. Those considerations were "the need to follow an orderly institutional process to resolve disputes, and . . . the need to preserve respect for courts and judicial orders."[12] Although the Fifth Circuit's opinion is comprehensive, it is certainly possible for another court to reach an opposing, yet an equally well-reasoned conclusion. Indeed, some state courts have permitted collateral attacks on silence orders in subsequent contempt proceedings and reversed convictions because of the invalidity of the orders.[13]

On the other hand, if the present appeal should be held to be moot, the district court would be hard pressed to deny any litigant accused of contempt for violating the order the opportunity to challenge it collaterally. To prohibit such an attack on the merits would mean that the district court's order would completely elude such challange. This situation, in and of itself, could well raise due process objections.

We need not, however, permit this appeal only by intimating that no challenge may be mounted to the underlying order in a contempt proceeding. Instead, it would seem appropriate to acknowledge that though, in functional terms, there are compelling reasons supporting the apparently conflicting positions taken in *Dickinson* and by some state courts, this Circuit has not yet been presented with a collateral attack on a silence order in a contempt proceeding. To establish the rule in this Circuit, we must await such event. Until then, appeals like the present one should not be regarded as moot on the ground that the litigant may not attack the merits of the order in a contempt proceeding because such is not, at this time, the law of this Circuit. Instead, the possibility that this Circuit may follow the *Dickinson* precedent should suffice to prevent viewing this appeal as moot. Should this court ultimately hold collateral attack to be available, appeals similar to this one, from the date of such decision, may well be regarded as moot.[14]

---

11. 465 F.2d 496 (5th Cir. 1972).

12. Rendleman, Free Press—Fair Trial: Review of Silence Orders, 52 N.C.L.Rev. 127, 158 (1973).

13. See Younger v. Smith, 30 Cal.App.3d 138, 106 Cal.Rptr. 225 (1973); Wood v. Goodson, 253 Ark. 196, 485 S.W.2d 213 (1972); State v. Sperry, 79 Wash.2d 69, 483 P.2d 608, cert. denied sub nom. McCrea v. Sperry, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed. 2d 252 (1971). The state courts suggested in these cases that each of the orders was subject to collateral attack, for example, because it was "void . . . as distinguished

from one that is merely erroneous," 483 P. 2d at 611, or because the defect was "jurisdictional." Yet it is difficult to distinguish the orders at issue in those cases from that involved in *Dickinson* on the basis of their relative patent invalidity, the standard apparently used by the state courts to determine whether the order was void or that its issuance amounted to a jurisdictional defect.

14. If collateral attack of silence orders in some situations is eventually permitted, a litigant who disobeys an order may be required to await a contempt proceeding rather than appealing prior to the institution of

## II.

Upon the basis of the Court's purported supervisory power, the plurality proceeds to erect some procedural requirements that should be met before such an order is issued. This approach is somewhat disquieting. Appellate courts, it appears, exercise their supervisory power over lower courts to impose procedural requirements that seem wise, but that are not compelled by the Constitution or statute.[15] However, a fair reading of the pertinent case law suggests that First Amendment considerations do, in fact, dictate procedural requirements like those set forth by the majority. Thus, I would not rely in this case on the rubric of "supervising powers."

Rather, I would note that, assuming arguendo there may be a prior restraint,[16] no order should issue unless, at the every least, certain procedures, designed to assure that the imposition on freedom of speech or press is

such proceeding. Any attempt to challenge a silence order in a context like that presented by this case would then likely be regarded as not ripe until a contempt proceeding takes place.

15. *See, e.g.*, McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1942). Since, in my view, certain procedural requirements are compelled by First Amendment considerations, I need not, as the dissent does, reach the issue whether this Court has the power to impose similar procedural requirements pursuant to its supervisory powers.

16. *See* Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). "Speaking very generally, the doctrine [of prior restraint] holds that governmental restrictions cannot be imposed upon speech or ot'.er kind of expression in advance of publication." Emerson, The System of Freedom of Expression, 503–04 (1970).

In Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Supreme Court, in sustaining a state prison regulation that limited a newsman's ability to secure personal interviews with prisoners of his choice, suggested that the availability of alternative avenues of access meant that the state did not have to meet the heavy burden required to justify prior restraints. In the case at hand, the publication of certain material has been completely foreclosed for a period of time. Thus, even if the order of the district. court had issued after the observance of the appropriate procedural safeguards, the Government would have to meet this heavy burden in order to secure affirmance of the order.

The dissent takes the position that once material is published any prohibition on future publication no longer constitutes a prior restraint. Dissenting Opinion at 17 n. 1. Apart from noting that republication constitutes a repetition, the dissent offers no reasons supporting such a distinction between previously published and unpublished materials for the purposes of prior restraint analysis. Nor does it refer to any case law suggesting such a distinction. The dissent later in its opinion, lists several factors that, in its judgment, buttress the district court's order in this case. First, the material related to historical as opposed to current facts. Second, the material concerned past indictments which are not determinations of guilt. Third, "the information had already been disseminated. . . ." Fourth, it was no longer "hot news." Lastly, the trial was to last only one day. Dissenting Opinion at 26.

The dissent would appear inaccurate in suggesting that the ban on publication would last only one more day. The order was issued on Friday and the trial was to resume after a three-day holiday weekend. Hence, the ban was to remain in effect 4 or 5 days longer. More importantly, however, it is difficult to see how the factors listed by the dissent affect a determination whether a prior restraint exists or whether the order should be sustained. Decisions that particular material is newsworthy, important, or "hot news" seem precisely those that, under our constitutional scheme, are to be left to the press and are not to be made by public officials, judicial or otherwise. The Supreme Court recently reaffirmed this principle in The Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L. Ed.2d 730 (1974) in unequivocal terms:

A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size of the paper, and content and treatment of public issues and public officials—whether fair or unfair—constitutes the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time. 94 S.Ct. at 2840.

not excessive, are dutifully followed. In this case such procedures were not followed and, thus, the district court's order may not stand. I recognize that my approach may appear to differ merely in form from that of the plurality, but, when constitutional issues are implicated, apparent differences of form in one case can, in a later cause, have profound substantive implications.[17]

In this case, the district court sought to restrict a form of expression that is among those accorded the greatest protection by the First Amendment against all types of restraint. To secure a free and agressive press may well be regarded as the primary objection of the Amendment. Individuals and institutions, in their private capacities, not government officials, should determine what is to be published. Otherwise, the free flow of information and ideas from non-official sources that helps to assure the proper functioning of a democratic republic will be lost.[18] Attempts to suppress material before newspaper publication are rare in our history. Justice Brennan has commented that "[s]o far as I can determine, never before [New York Times Co. v. United States] [19] has the United States sought to enjoin a newspaper from publishing information in its possession." [20]

It is not surprising, therefore, that it is in the obscenity area—an area explicitly exempted from First Amendment protection [21]—that the Supreme Court has had the opportunity to formulate procedures to be followed before material potentially protected by the First Amendment may be suppressed. The material here, unlike arguably obscene matter, is unquestionably within the Amendment's protection. "If the Constitution requires elaborate procedural safeguards in the obscenity area, a fortiori it should require equivalent procedural protection when the speech involved [like that here] . . . implicates more central First Amendment concerns."[22]

In Freedman v. Maryland,[23] the Supreme Court emphasized "the burden of proving that the [motion picture] is unprotected expression must rest on the censor," and that "a judicial determination in an adversary proceeding" is necessary.[24] In Kingsley Books, Inc. v. Brown,[25] the Supreme Court approved a New York statutory procedure that permitted the permanent prohibition of the distribution of books only after notice

---

17. According to the dissent, discussion of the issues in this case must begin with the Sixth Amendment because it is the "beginning." Apparently it is the dissent's view that the extensive scholarly discussion of the ostensible conflict between First and Sixth Amendment values results from a misapprehension of the "beginning." Since the district court was prompted by Sixth Amendment considerations in issuing the oral order, the contention is that *we* must "begin" with the Sixth Amendment too. Presumably if the district court, prompted by First Amendment considerations, had refused to issue a silence order, the First Amendment, rather than the Sixth Amendment, would have been the "beginning" and, for that reason, such refusal would be properly affirmed. To allow conflicts between constitutional provisions to be resolved in such a fortuitous manner would appear inconsistent with principled constitutional analysis.

18. *See* The Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L. Ed.2d 730 (1974).

19. 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

20. *Id.* at 725, 91 S.Ct. at 2147 (Brennan, J., concurring).

21. Obscene material is not protected speech under the First Amendment. *See, e.g.,* Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

22. Monaghan, First Amendment "Due Process," 83 Harv.L.Rev. 518, 519 (1970).

23. 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

24. *Id.* at 58, 85 S.Ct. at 739.

25. 254 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). In *Kingsley Books,* the Court, by a 5–4 majority, approved a statutory scheme that permitted suppression of allegedly *obscene* matter for two days pending a judicial determination whether or not the matter is, in fact, obscene. The area of obscenity is one of the very few where a prior restraint of limited duration has been permitted.

and an adversary hearing resulted in a determination that the particular book is obscene.

In a case not involving obscene material, the Supreme Court, in Carroll v. President and Commissioners of Princess Anne,[26] struck down an injunction against the staging of a political rally because—somewhat similar to the circumstances here—it was issued *ex parte*,[27] and without notice or any effort to secure the participation of those subject to the interdiction. The Court expressed the substantial concerns that support the imposition of procedural protection when a judicial decision touches upon First Amendment values:

> Judgment as to whether the facts justify the use of the drastic power of injunction necessarily turns on subtle and controversial considerations and upon a delicate assessment of the particular situation in light of legal standards which are inescapably imprecise. . . .
>
> The same is true of the fashioning of the order. An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. . . . In other words, the order must be tailored as precisely as possible to the exact needs of the case. The participation of both sides is necessary for this purpose.[28]

The attention thus given to the process antecedent to the promulgation of restraints on speech or publication reflects a deep-rooted conviction that such steps, correctly conceived and carefully followed, will increase the likelihood that decisions affecting First Amendment rights will not unconstitutionally impair the exercise of those rights. Different circumstances may well call for different procedures, but any procedure must be directed to the end of achieving a thorough and well-reasoned decision properly deferential to First Amendment interests.

The core of any such process is adequate notice to the parties affected and an adversary hearing. Further, it would seem that any decision to restrain must be consonant with the record as developed at the hearing, and must be based on particularized findings.[29] Whether or not testimony need be taken depends, of course, on the existence and nature of any factual disputes affecting First Amendment values. The trial court should state carefully the reasons for its order and why it deems less drastic alternatives inappropriate. Finally, an order inhibiting the exercise of the First Amendment should be drawn in explicit terms so as to indicate clearly the bounds of its restrictions.[30]

In the context of a silence order sought to be imposed against the press, it would seem that a judge should notify the affected parties of any request for a silence order, extend to them adequate time to prepare for a hearing, and conduct a hearing if the request for a silence order is not frivolous on its face. Any such hearing must explore the possibility of attaining, in the particular case, an acceptable accommodation of First and Sixth Amendment values along the lines suggested by the Supreme Court in decisions such as Sheppard v. Maxwell,[31] and by the several studies made of the problem.[32]

---

26. 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). *See* Procunier v. Martinez, 416 U.S. 396, 416, 94 S.Ct. 1800, 1813, 40 L.Ed.2d 224 (1974).

27. At the time the oral order was issued in this case apparently the only representative of The Philadelphia Inquirer present was Ms. Stranahan, a reporter.

28. 393 U.S. at 183–184, 89 S.Ct. at 353.

29. Tinker v. Des Moines School Dist., 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

30. *See, e. g.,* Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

31. 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

32. *See, e.g.* Report of the Committee on the Operation of the Jury System on the "Free Press—Fair Trial" Issue, 45 F.R.D. 391

The party seeking to restrict First Amendment rights should bear the heavy burden of establishing the necessity for the requested silence order.[33] Although a judge must exhibit utmost caution to assure that a criminal trial is free of potentially prejudicial influences, he is required, at the same time, to bear in mind the exalted niche occupied by the freedom of the press in our system of constitutional values. He must, therefore, be acutely aware of the burden that need be met—if it can be met at all—before a prior restraint may constitutionally be imposed. Finally, the decision should reveal the facts and reasons supporting it, and the ultimate order should be in written form so as to obviate any ambiguity created by less formal, oral orders.

This case forcefully illustrates that failure to adhere to such procedures may well lead to impermissible infringements upon First Amendment rights. The record reveals that the oral order here was preceded by no hearing whatsoever.[34] Counsel for representatives of the media did not have an opportunity to present argument or call witnesses before the oral order was issued. The hearing on the motion to vacate the oral order occurred within two hours of its issuance. Hence, it would appear that notice to appellants was inadequate and, indeed, the brevity of the hearing on the motion to vacate the oral order suggests its perfunctory character in view of the important questions at stake.

The dissent would place upon the media the burden of assuring that a silence order be issued only after careful adherence to procedures designed to secure full exposition of all relevant considerations. Because First Amendment rights of the press are at stake, the district court and the party seeking to restrict the press should, in my view, be assigned the primary responsibility of assuring that procedural prerequisites sensitive to First Amendment values be followed. This is particularly so where the press is at the outset merely an observer of the judicial proceedings and does not become a litigant represented by counsel until, as here, an order affecting its interests has already issued.

Moreover, this case provides an example of the ambiguity likely to be created by the hasty issuance of an oral order in circumstances such as these. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."[35] The extent of the restraints imposed, as the plurality's recitation of the various discussions between the court and the parties and their counsel demonstrates, is by no means clear. This ambiguity, in and of itself, raises serious vagueness problems.[36]

The oral order was not transcribed until October 10, 1973. It would appear that the press, at the time the district court orally issued the order, could have reasonably understood that they were forbidden from publishing *any*

---

(1968) (known as the "Kaufman Committee Report") ; Reardon, The Fair Trial-Free Press Standards, 54 A.B.A.J. 343 (1968) ; Freedom of the Press and Fair Trial: Final Report with Recommendations by the Special Committee on Radio, Television and the Administration of Justice of the Association of the Bar of the City of New York (Columbia University Press, 1967) (known as the "Medina Report").

33. *See* New York Times Co. v. United States, 403 U.S. 713, 715, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam) ; Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971).

34. The dissent correctly notes that it is the motion to vacate the oral order, not the oral order *per se*, that is the subject of this appeal. (Dissenting Opinion at 19–20.) Nevertheless, the precise issue raised by the motion to vacate was the propriety of the oral order. Thus, the adequacy of the procedural incidents surrounding the oral order may be addressed on this appeal.

35. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963).

36. *See, e. g.*, Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

material relating to Schiavo's case that had not already been presented in the courtroom. In fact, the court stated at 4:00 P.M. on October 5th that it had told appellants that if what they published "had not come out here in the courtroom [it] would consider that contempt." Although the dissent is correct in pointing out that the court seemed to be essentially concerned with the publication of references to Schiavo's pending indictments, the order itself was not so circumscribed. A restraint encompassing a prohibition against the publication of nonprejudicial material as well as potentially prejudicial material, seems unconstitutionally overbroad [37] since it does not conform with the proffered justification of the order—protection of Sixth Amendment rights.

Indeed, the district court's opinion, itself, denying Schiavo's motion for a new trial or judgment of acquittal, strongly suggests that had the trial court set in motion procedures designed to secure a full exposition of all relevant considerations, it may well have decided that some of the less drastic prophylactic devices enumerated in *Sheppard* would have satisfactorily removed any danger of prejudice from the publication of the restrained material. In denying Schiavo's motions, the district court made the following observations:

> In further support of his motion for a new trial, Schiavo contends I committed error in refusing to grant a continuance or, in the alternative, a mistrial because of the prejudicial publicity that occurred before and during the trial. Being aware of the publicity that appeared in connection with the Martin Hess murder, I conducted an extensive voir dire of the entire panel to find if any venire man recalled the event. In addition, I instructed the jury at the close of each day's session not to listen to, read about, or participate in any discussion concerning this case. Each morning I questioned each juror individually as to whether my instructions had been obeyed. In every instance the response showed my admonitions had been followed. Although better cooperation by members of the press during trial would have been desirable, *there is absolutely no indication that any member of the jury was aware of news stories concerning either the trial or related matters.* (emphasis added)

Even if a careful voir dire were not considered adequate, there were other alternatives available. For example, since it appeared at the time of the oral order that Schiavo's trial might have been concluded with one more day of evidence, the district court may well have determined that the inconvenience to jurors would have been minimal had it chosen to continue proceedings into Friday evening and, if necessary, to conduct the final day of trial on Saturday.[38]

In sum, although concurring I do not join the plurality's opinion for the following reasons. While the court declines to hold this appeal moot, it should make clear that the opportunity for collateral attack in a contempt proceeding predicated on a silence order is not necessarily foreclosed. Also, we should hold, in my judgment, without intimating any view as to the constitutionality of a limited silence order issued after a hearing embodying the procedural safeguards indicated, that the order here must fall in any event because its issuance was not preceded by the type of hearing compelled by the First Amendment values at stake. In doing so, I would not rely, as the plurality does, on the Court's supervisory power to impose procedural guidelines. Rather, the case law establishes quite clearly that such

---

37. *See, e. g.*, Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

38. Assuming that a late Friday session and a Saturday session would have completed the proceedings, the district court would have been in a position to determine whether or not the jurors should have been sequestered on Friday night.

procedural safeguards are required by First Amendment considerations. Further, the plurality does not suggest, as I do, that the order itself in this case appears to exhibit some of the very vices —vagueness and overbreadth—that the proposed procedural safeguards are intended to eliminate. Finally, there is no showing that any less drastic· steps would not have been effective in eliminating the danger of prejudice.

Judges GIBBONS and GARTH join in this concurring opinion.

ALDISERT, Circuit Judge (dissenting, with whom WEIS, Circuit Judge, joins).

That solutions to this vexatious appeal are fragmented and do not command a majority should come as no surprise. Each solution is unerringly foreordained by the starting point of the several opinions.

I choose to begin at the beginning, to view the action of the district judge as an affirmative effort to vindicate the Sixth Amendment right of a defendant being tried in a criminal case before him. I see the First Amendment issue surfacing only as a defense lodged by appellants to the imposition of the silence order.

## I.

Under the aegis of the exercise of the court's supervisory power the plurality retroactively enunciates a new rule of procedure requiring that a silence order

vindicating a criminal defendant's Sixth Amendment rights, if it refers to non-parties, must (a) be reduced to writing, (b) state specifically the terms of the order and the reasons therefor, and (c) be entered on the district court docket.

But this court has no power to prescribe procedural rules for the governance of the district courts. That power is vested, by statute, in the Supreme Court. 18 U.S.C. §§ 3771, 3772; 28 U. S.C. §§ 2072, 2075. At the very most, the suggestions of the plurality should have been directed to the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, 28 U.S.C. § 331, instead of incorporating them by judicial fiat in an in banc opinion.[1]

## II.

Assuming the advisability of the suggested procedures, and assuming the supervisory power to prescribe these procedures, no trial court should be reversed for failing to follow in October, 1973, rules which were not conceived until August, 1974. *See* Fisher v. Volz, 496 F.2d 333, 350–351 (3d Cir. 1974) (Aldisert, J., concurring and dissenting opinion). At the very most, the rules should have been applied prospectively; a practice observed by us in promulgating new jury instructions in United States v. Barber, 442 F.2d 517 (3d Cir. 1971), cert. denied, 404 U.S. 958, 92 S. Ct. 327, 30 L.Ed.2d 275 (1971), and United States v. Fioravanti, 412 F.2d 407 (3d Cir. 1969), cert. denied, 396 U. S. · 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969).

---

1. Judge Adams would also require certain procedures to be followed before issuance of a silence order to non-parties. His approach is premised not on our supervisory power but on the dictates of the First Amendment in a case of prior restraint. But we are not presented with a prior restraint case; the material had already been published. The silence order was directed to a prohibition of a *repetition* of limited mate-

rial for an extremely limited period—one more day of trial:
> THE COURT: All I am asking is that for *one more day* until this case is over you do not publish that the man is indicted somewhere else and I really do not think that is a bit unfair.

N.T. at 5 (October 5, 1973). (My emphasis.) *See, infra,* p. 26.

## A.

It is suggested by both the plurality[2] and by Judge Adams[3] that the appellants did not know the precise contours of the silence order or the reasons for its imposition by the trial court. However, I find explicit specificity as to the *appellants* in these proceedings, Miss Stranahan and the Philadelphia Inquirer. Judge Ditter ordered them not to republish the information that the defendant Schiavo, then on trial for perjury, had been previously charged with other crimes.[4] I find this to be a fair reading of the court's oral order as to the only appellants in these proceedings. We are not permitted, in the context of this case and controversy, to evaluate Judge Ditter's language in the abstract as to its possible effect on others. "[O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L. Ed.2d 524 (1960). There is no reason why this doctrine should not apply in this case.

## B.

Similarly, the reason for the imposition of the silence order fairly appears in the record. Judge Ditter was attempting to vindicate Schiavo's Sixth Amendment right to a fair trial before an impartial jury. It came to his attention that a newspaper article had appeared in the Philadelphia Inquirer conveying the information that Schiavo was also charged with conspiracy to kill a government informer. The trial court then meticulously conducted a *voir dire* examination of each of the jurors wherein it asked, *inter alia*, "It has come to my attention that there was an article in one of the Philadelphia papers which did refer to this case. . . . Did you see the article in the paper?" Following the examination the court was satisfied that the trial could continue.

Defense counsel then requested:

Your Honor, perhaps if the newspaper could be told not to make refer-

---

**2.** "The appellants could act only at their own risk since they were subject to the threat of criminal contempt for failure to comply with the order, and such risk was necessarily increased by the fact that the *appellants had no written version of the order detailing precisely what conduct was prohibited.*" (Plurality Opinion at 8.) *But see* plurality's orientation paragraph of their opinion: "Philadelphia Newspapers, Inc. (hereinafter the 'Philadelphia Inquirer') and Susan Q. Stranahan, appellants in No. 73–1855 and petitioners in No. 73–1856, seek reversal of a written and docketed district court order refusing to vacate an oral order, announced from the bench, *enjoining them and other news media representatives from publishing, during the perjury trial of Frederick Schiavo, information concerning murder and conspiracy indictments pending against Schiavo in a related matter.*" (My emphasis.) Pages 2, 3 supra.

**3.** "It would appear that the press, at the time the district court orally issued the order, could have reasonably understood that they were forbidden from publishing *any* material relating to Schiavo's case that had not already been presented in the courtroom." (Pages 15, 16.)

**4.** *See* Plurality opinion, n.3:

"THE COURT: And specifically I told Miss Stranahan that she had in a story byline that had been pointed out that this defendant had been indicted in New Jersey and had been indicted for other offenses in this jurisdiction. I said that there was to be no repetition of that story or those facts and that if it was repeated I would consider it a matter of contempt of court and I would consider holding her liable for contempt and holding her editors liable for contempt."

Judge Adams seeks to characterize the court's oral order as being issued *ex parte* because "the only representative of the Philadelphia Inquirer present was Ms. Stranahan, a reporter." (Page 14 n.27.) Yet this facially innocent footnote can unwittingly mislead one into believing that Miss Stranahan, unfamiliar with the facts leading to the oral order, was a victim of her 2 p.m. fortuitous presence in Judge Ditter's courtroom. This inference is totally inaccurate. The oral order was not issued *ex parte*. Miss Stranahan, "a reporter," was the very person who wrote the offensive story bearing her byline.

ence to the fact, if they are reporting it in the press, that Mr. Schiavo has also been indicted in another matter. Perhaps that would take at least some of the sting away from any of that publicity that might get into the hands of the jurors.

THE COURT: Well, I will be glad to make that request to the members of the press.

The members of the press were brought into the courtroom and addressed by the court.[5] On the next day a second article appeared in the Philadelphia Inquirer stating that "Schiavo also is charged by the Federal government with conspiracy to kill Hess and with first-degree murder in New Jersey." It will be noted that the second article, published after the district court's request, contained a more graphic description of the other charges against Schiavo than the earlier publication. Judge Ditter then called the press representatives to his chambers, had a colloquy with them which is not on the record and then, proceeding into open court, expressed the verbal silence order. To raise an issue about lack of reasons for the imposition of the silence order in this case is to raise an issue that is both unwarranted and undeserving of serious consideration.

Thus, it cannot seriously be contended that the court's order lacked specificity or that these appellants were unaware of the reasons therefor.

### C.

Both the plurality opinion and Judge Adams' concurrence state that a necessary prerequisite to a silence order is adequate notice and a hearing. I agree. I also agree with Judge Adams' assertion that appellants "did not have an op-

portunity to present argument or call witnesses" prior to the issuance of the 2 p. m. oral order. But the 2 p. m. oral order was not appealed. Rather, it is the written and docketed order resulting from the 4 p. m. hearing which is properly before this court.

I cannot summon a modicum of agreement with Judge Adams' conclusions: "Hence, it would appear that notice to appellants was inadequate and, indeed, the brevity of the hearing . . . suggests its perfunctory character in view of the important questions at stake."

Appellants were given precise and particular notice of the desire of the court on October 4, twenty-four hours before the October 5 oral silence order. Although Judge Adams would depict the proceedings as fraught with "inadequate notice" and a "hasty issuance of an oral order," his observations overlook the fundamental role particular circumstances play in assessing the adequacy of notice and hearing. If there was brevity it must be attributed to appellants. They chose not to present witnesses; the court did not exclude them. If there was haste in the scheduling of the hearing, it must be attributed to appellants; the court did not delay; the court heard them immediately upon presentation of their motion. Appellants had an edition to put out and a story to run. They sought to have the ban lifted. They were unsuccessful. They then ran the story in defiance of the ban they unsuccessfully sought to lift. Appellants controlled both the time of the hearing and its length. They and they alone fashioned the "brevity" and "perfunctory character" of the hearing. For this the trial court should not be

---

5. THE COURT: Lady and gentlemen, the defendant in this case is charged with perjury. There is an article in this morning's Inquirer which points out that he was also charged with another crime.

I would ask you, please, that if you feel that you must write about this case, write about this case and not about other cases. It makes it most difficult to carry on a crimi-

nal trial if this sort of thing happens, and I would ask each of you, please, to try to be aware of the problem with the Court and criminal defendants.

I know I can't tell you what to write, but I would hope that you would be aware of the problems that you create, at least.

All right, thank you very much.

faulted; *a fortiori,* for this it should not be reversed.

In sum, this court is presented with a factual complex where the oral silence order was specific as to these appellants. The reasons for its imposition were known to them. The trial court afforded them adequate notice and hearing. Accordingly, I find no prejudicial error in the procedures followed by Judge Ditter.

### III.

Having found no prejudicial error in the procedure utilized by the district court, I must, and do, reach the merits of the "Free Press—Fair Trial" issue. For my part, I would take as a starting point the recognition that the First Amendment is one of several rights protected in the Bill of Rights. It is said that freedom of speech is given a preferred position. Thomas v. Collins, 323 U.S. 516, 527 n.12, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Murdock v. Pennsylvania, 319 U.S. 105, 115, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). But this is not to say that the First Amendment may pre-empt every other provision of the Bill of Rights when the interests to be protected by the First Amendment come into conflict with interests protected by other constitutional guarantees. "The preferred position of freedom of speech in a society that cherishes liberty for all does not require legislators to be insensible to claims by citizens to comfort

and convenience. To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself." Kovacs v. Cooper, 336 U.S. 77, 88, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949). (Footnote omitted.) When the several multiple protections of basic constitutional principles conflict, a choice of values is necessitated. Professor Wechsler admonishes us that the choice must be made "on an adequate and principled analysis. . . . Surely a stronger analysis may be advanced against a particular uncompensated taking as a violation of the fifth amendment than against a particular limitation of freedom of speech or press as a violation of the first. In this view, the 'preferred position' controversy hardly has a point —indeed, it never has been really clear what is asserted or denied to have a preference and over what. Certainly the concept is pernicious if it implies that there is any simple, almost mechanistic basis for determining priorities of values having constitutional dimension, as when there is an inescapable conflict between claims to free press and a fair trial. It has a virtue, on the other hand, insofar as it recognizes that some ordering of social values is essential; that all cannot be given equal weight, if the Bill of Rights is to be maintained."[6]

In the context of free press-fair trial, it has been held that the "preferred position" of the First Amendment must give way to "fair trial—the most fundamental of all freedoms."[7]

---

6. Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 25–26 (1959) (footnote omitted).

7. This preferred position has never been approved in a case where a balance must be had between free speech and fair trial. Indeed, the Court has awarded the preference to fair trial. In Estes v. Texas, 381 U.S. 532, 540–541, 85 S.Ct. 1628, 1632, 14 L.Ed. 2d 543 (1965), the Court said:

"We have always held that the atmosphere essential to the preservation of a fair trial —the most fundamental of all freedoms— must be maintained at all costs. Our approach has been through rules, contempt proceedings and reversal of convictions obtained under unfair conditions. Here the remedy is clear and certain of application

and it is our duty to continue to enforce the principles that from time immemorial have proven efficacious and necessary to a fair trial."

United States v. Tijerina, 412 F.2d 661, 667 (10th Cir.), cert. denied, 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969).

Even prior to the Supreme Court's enunciation in *Estes,* the Court did not indicate that the First Amendment was to be preferred over other provisions of the Bill of Rights. Discussing the Fifth Amendment application in Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Court noted in Grosjean v. American Press Co., Inc., 297 U.S. 233, 243, 56 S.Ct. 444, 80 L.Ed. 660 (1936):

We concluded that certain fundamental rights, safeguarded by the first *eight*

## IV.

### A.

Appellants' basic argument in this appeal is clear and clean cut. They contend that no court may prevent the publication of court news under any circumstances because such news is a matter of public record.[8] This approach, of course, is simplistic. The Supreme Court has never taken the absolutist view of the First Amendment as urged by the appellants[9] and the authorities cited by them do not support this view. Learned Hand taught us that "[t]he privilege of 'free speech,' like other privileges, is not absolute; it has its seasons; a democratic society has an acute interest in its protection and cannot live without it; but it is an interest measured by its purpose."[10]

In Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, 919–920, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950), Justice Frankfurter, in a separate opinion respecting the denial of a petition for certiorari, posed the countervailing considerations:

> Freedom of the press, properly conceived, is basic to our constitutional system. Safeguards for the fair administration of criminal justice are enshrined in our Bill of Rights. Respect for both of these indispensable elements of our constitutional system presents some of the most difficult and delicate problems for adjudication when they are before the Court for adjudication. It has taken centuries of struggle to evolve our system for

bringing the guilty to book, protecting the innocent, and maintaining the interests of society consonant with our democratic professions. One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system of criminal justice is fair and right. On the other hand our society has set apart court and jury as the tribunal for determining guilt or innocence on the basis of evidence adduced in court, so far as it is humanly possible. It would be the grossest perversion of all that Mr. Justice Holmes represents to suggest that it is also true of the thought behind a criminal charge " . . . that the best test of truth is the power of the thought to get itself accepted in the competition of the market." Abrams v. United States, 250 U.S. 616, 630 [40 S.Ct. 17, 22, 63 L.Ed. 1173]. Proceedings for the determination of guilt or innocence in open court before a jury are not in competition with any other means for establishing the charge.

New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971), was decided on a narrow issue, the Court merely holding that the government did not meet its " 'heavy burden of showing justification for the imposition of such a [prior] restraint.' Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 [91 S.Ct. 1575, 1578, 29 L.Ed.2d 1]

---

amendments against federal action, . . . [also included] the fundamental right of the accused to the aid of counsel in a criminal prosecution. . . . [F]reedom of speech and of the press are rights of the *same* fundamental character. . . .

297 U.S. at 243–244, 56 S.Ct. at 446. (My emphasis.)

8. They also argue that the oral order lacked specificity. (*See, supra*, pp. 17–18.)

9. Justices Black and Douglas, long champions of the broad sweep of the First Amendment,

concede "Freedom of expression can be suppressed if, and to the extent that, it is so brigaded with illegal action as to be an inseparable part of it. Giboney v. Empire Storage Co., 336 U.S. 490, 498 [69 S.Ct. 684, 688, 93 L.Ed. 834] ; Labor Board v. Virginia Power Co., 314 U.S. 469, 477–478 [62 S.Ct. 344, 348, 86 L.Ed. 348]." Roth v. United States, 354 U.S. 476, 514, 77 S.Ct. 1304, 1324, 1 L.Ed.2d 1498 (1957) (dissenting opinion).

10. NLRB v. Federbush Co., Inc., 121 F.2d 954, 957 (2d Cir. 1941).

(1971)."[11] Near v. Minnesota, 283 U.S. 697, 708, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931), stated flatly: "Liberty of speech, and of the press, is also not an absolute right, and the State may punish its abuse."

Coming to grips with the free press-fair trial issue, Sheppard v. Maxwell, *supra*, 384 U.S. 333, 349–350, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), announced the doctrine which I embrace today—the press has virtually unlimited freedom to publish so long as there is "no threat or menace to the integrity of the trial":

> This Court has . . . been unwilling to place any direct limitations on the freedom traditionally exercised by the news media for "[w]hat transpires in the court room is public property." Craig v. Harney, 331 U.S. 367, 374 [67 S.Ct. 1249, 1254, 91 L.Ed. 1546] (1947). The "unqualified prohibitions laid down by the framers were intended to give to liberty of the press . . . the broadest scope that could be countenanced in an orderly society." Bridges v. California, 314 U.S. 252, 265 [62 S.Ct. 190, 195, 86 L.Ed. 192] (1941). And where there was "no threat or menace to the integrity of the trial," Craig v. Harney, *supra*, [331 U.S.] at 377, [,67 S.Ct. at 1255], we have consistently required that the press have a free hand, even though we sometimes deplored its sensationalism.

. . . .

Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances.

In Branzburg v. Hayes, 408 U.S. 665, 684–685, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 730, 91 S.Ct. at 2149. Justice White said: "I do not say that in no circumstances would the First Amendment permit an injunction against publishing information about government plans or operations, . . . " but found that the government "has not satisfied the very heavy burden that it must meet to warrant an injunction. . . . " 403 U.S. at 731, 91 S.Ct. at 2150, and suggested that Congress had provided criminal sanctions, 403 U.S. at 737–738, 91 S.Ct. 2140 for use by the government. Justice Marshall said: "The issue is whether this Court or the Congress has the power to make law. . . . The problem here is whether in these particular cases the Executive Branch has authority to invoke the equity jurisdiction of the courts to protect what it believes to be the national interest." 403 U.S. at 741, 91 S.Ct. at 2155. Relying on the congressional history of 18 U.S.C. § 793(e), Justice Marshall found that "Congress has *specifically rejected passing legislation that* would have clearly given the President the power he seeks here and made the current activity of the newspapers unlawful." 403 U.S. at 745, 91 S.Ct. at 2157. In sum, the *New York Times* case does not support appellants' constitutional contention of the absolute supremacy of the First Amendment.

---

11. The opinions of the several justices concurring in the majority opinion in New York Times v. United States, *supra*, are instructive. Unlike the clear Sixth Amendment principle which collides with the First Amendment in this case, in the Pentagon papers case there was no explicit constitutional protection inuring to the President. Justice Black observed that the government relied only on "the constitutional power of the President over the conduct of foreign affairs and his authority as Commander-in-Chief." 403 U.S. at 718, 91 S.Ct. at 2143. Justice Douglas, concurring with Justice Black, also observed: "There is, moreover, no statute barring the publication by the press of the material which the Times and the Post seek to use." 403 U.S. at 720, 91 S.Ct. at 2145. Justice Brennan emphasized the burden associated with prior restraint and emphasized that "if the Executive Branch seeks judicial aid in preventing publication, it must inevitably submit the basis upon which that aid is sought to scrutiny by the judiciary." 403 U.S. at 727, 91 S.Ct. at 2148. Justice Stewart could not say that disclosure of any of the Pentagon papers will surely result in "direct, immediate, and irreparable damage to our Nation or its people. That being so, there can . . . be but one judicial resolution of the issues before us." 403 U.S. at

626 (1972), the majority opinion [12] flatly states: "Newsmen . . . may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal." *Sheppard* also recognized: "From the cases coming [to the Supreme Court] . . . we note that unfair and prejudicial news comment on pending trials has been increasingly prevalent. . . . If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception." 384 U.S. at 362, 363, 86 S.Ct. at 1522.[13]

### B.

It is therefore necessary to determine how to accommodate the interest in full, robust and unrestricted dissemination of information as protected by the First Amendment with the fundamental requirement that a jury's verdict must be based upon the evidence adduced at trial as protected by the Sixth Amendment.[14] Only the most cynical would suggest that a jury would be insensitive to the receipt of information that a defendant on trial for perjury was also "charged with conspiring to kill a government informer," as published by the Inquirer on October 4, 1973, and "charged by the Federal government with conspiring to kill Hess and with first-degree murder

in New Jersey" as published the next day. Appellants do not seem to challenge the presence of this present threat to the integrity of a fair trial. Instead their counsel suggested to the trial court: "Either you keep the jury sequestered until the trial is completed, if you think that is necessary, or I think it is sufficient here to instruct the jurors not to read anything in the paper about this case."

This then brings me to the responsibility of deciding whether the district court abused its discretion in issuing a silence order instead of employing alternate remedies of sequestration, additional *voir dire*, additional instructions, and the declaration of a mistrial.

Sequestering a jury is the most efficient method of isolating a jury from influences beyond the courtroom. To recognize the effectiveness of this device, however, is not to ignore its attendant harmful effects. Under certain circumstances, the harm to a defendant may be minimized. When prospective jurors know at the time of empanelling that they are to be sequestered, they may advise court and counsel at *voir dire* of any health or family problems which would militate against service on a sequestered jury. But, when this device is foisted upon jurors in mid-trial, I am not at all certain that the act of sequestration does not have the capacity to generate possible animosity against the defendant.[15] Should sequestration be

---

12. By Justice White for himself, the Chief Justice, Justice Blackmun, Justice Powell and Justice Rehnquist.

13. More recently we have noted United States v. Carmine Persico, No. 72–Cr–1221 (E.D.N.Y.1972), in which the press was requested to refrain from emphasizing the past criminal record of the defendant on trial and where, as here, the press refused to cooperate. The publications precipitated a mistrial on September 25, 1973. For a penetrating analysis of the root issue before us, *see* The Issue of Fair Trial v. Free Press, New York L.J., June 20–21, 1974, by John R. Bartels, United States District Judge, who presided in the *Persico* case.

14. The fundamental nature of one's Sixt'ı Amendment right to be tried by an impartial

tribunal found vivid expression in Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965) : "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." (Footnote omitted.)

15. The jurors are denied the comforts of home and family. Their contacts and communications with the outside world are limited. In a case where the defendant is on bail during a trial, it is not beyond the probabilities of human experience to suggest a possible generating of animosity toward the defendant who is free while they are confined.

ordered mid-trial as contended here, with an accompanying inquiry as to what was read or heard in the newspaper or broadcast media, the potential for prejudice is heightened, it being reasonable for jurors to conclude that comments being circulated were so serious and so adverse to the defendant that sequestration was mandated.

Appellants' suggestion that the problem may be cured by a simple instruction to the "jurors not to read anything in the papers about this case" is simplistic. To not read a certain article one must first scan the news stories or at least the headlines to determine what not to read; thus, to not read anything about a case one must first read.

A *voir dire* examination as to whether jurors have read about the case has but limited effect. Judge Ditter utilized this device on October 4, 1973. But to use *voir dire* daily, or repeatedly, might be a questionable practice because of its potential for generating self-induced infirmities by the very act of repetition. As a prophylactic measure, *voir dire* inquiry is to be encouraged; as a guaranteed method of insuring the trial's integrity, it leaves much to be desired. Complete success of this method requires total candor in the jurors' responses to special interrogatories, responses which are totally voluntary and completely free of having been influenced by a fear of sanctions by the court if a juror freely admits reading that which he had been forbidden to read.[16]

A fourth alternative is the declaration of a mistrial. In the *Persico* case, *supra,* note 13, the defendant agreed to waive trial by jury after the mistrial. But such a waiver resulted in the defendant abandoning a constitutional right. Alternatively, the court might postpone retrial to allow the passage of time to dilute the deleterious effect of the publication, or it might order a change of venue. Although this may be the only available alternative in certain cases, we have recently recounted the prejudice, financial and otherwise, inuring to a litigant put to the inconvenience of second trials.[17] Ferguson v. Eakle,

16. "One aspect of a recently completed study of the workings of the jury system was an examination of the nature and effectiveness of *voir dire* examinations of jurors in civil and criminal cases. On the basis of personal interviews of 225 jurors serving on a variety of cases over a one and one-half year period in a Federal District Court in the Midwest, it was concluded that '*voir dire* is grossly ineffective as a screening mechanism' and that 'jurors often, either consciously or unconsciously, lie on *voir dire*.' Broeder, Voir Dire Examinations: An Empirical Study, 38 So.Cal.L.Rev. 503, 528 (1965)." ABA Standards, Fair Trial and Free Press, 56.

17. These remedies and devices, then, are in need of greater refinement, and in many cases minimum constitutional standards appear to compel such a course. But in the Committee's view this course, while necessary, is not sufficient in itself. None of these techniques can at the same time (1) assure a fair trial in the face of prejudicial disclosures that saturate the jurisdiction and (2) preserve other rights of the defendant and the right of the people to see that the guilty are properly punished. For example, closing of certain judicial hearings requires waiver of the accused's right to a public trial and cannot prevent disclosures from other sources. A continuance, if it is to be long enough to dissipate the effects of the potentially prejudicial publicity, may require the defendant to sacrifice his right to a speedy trial. And its purpose will be defeated if t' e publicity is renewed when the case finally comes up. A change of venue may also require the sacrifice of state or federal constitutional rights (as will waiver of jury trial) and will undoubtedly be ineffective if the case is one of wide notoriety. *Voir dire*, as already noted, cannot fully cope with a juror's failure to be candid or with influences that occur below the level of consciousness. Sequestration of the jury does not remedy the effects of pretrial publicity and may itself prejudice the defendant because of the inconvenience and annoyance to the jurors. Admonitions to the jury have often proved ineffective. And finally, declaration of a mistrial or reversal of a conviction may involve the expense and inconvenience of a second trial, and if a second trial cannot be had, may result in the freeing of a guilty man, who but for the unfairness of his initial trial, would have been punished for his crime. ABA Standards, Fair Trial and Free Press, 75.

492 F.2d 26 (3d Cir. 1974). These publications did not relate to "hot news." They did not describe contemporary happenings. They described narrative or historical facts of past indictments. There was not the slightest indication that The Philadelphia Inquirer would not repeat the publications at a second trial. Appellants' persistence in ·continuing to publish an account that the defendant on trial in the Philadelphia federal court for perjury, was also under another federal indictment of conspiracy to commit murder as well as a state indictment for murder, gave no assurance that declaring a mistrial and rescheduling the case would have eliminated the problem.

Having discussed what I consider to be the deficiencies in sequestration, additional *voir dire,* additional instructions, and mistrial in this case, I am persuaded that there was no abuse of discretion in the district court's issuance of a silence order. Clearly, the district court had an option to exercise its discretion in an effort to vindicate the Sixth Amendment rights of the defendant. Professor Maurice Rosenberg reminds us:

> If the word discretion conveys to legal minds any solid core of meaning, one central idea above all others, it is the idea of *choice.* To say that a court has discretion in a given area of law is to say that it is not bound to decide the question one way rather than another.[18]

He distinguishes between primary discretion, "a wide range of choice to do

what [an adjudicator] pleases," a type of unreviewable discretion,[19] which is not before us here, and a type of reviewable discretion in a secondary form, which is before us:

> The other type of discretion, the secondary form, has to do with hierarchical relations among judges. It enters the picture when the system tries to prescribe the degree of finality and authority a lower court's decision enjoys in the higher courts. Specifically, it comes into full play when the rules of review accord the lower court's decision an unusual amount of insulation from appellate revision. In this sense, discretion is a review-restraining concept. It gives the trial judge a right to be wrong without incurring reversal.[20]

I am attracted to the expression of scope of appellate review—a rudimentary approach to a definition of "abuse of discretion"—enunciated by the Second Circuit:

> Had any one of us been in a position to exercise the discretion committed to a trial judge when such a request is made, we have no hesitancy in stating that the decision would have been otherwise; but as appellate judges we cannot find that the action of the district judge was so unreasonable or so arbitrary as to amount to a prejudicial abuse of the discretion necessary to repose in trial judges during the conduct of a trial.[21]

The keynote of this approach was earlier described by Judge Henry J. Friendly as an attitude of "appellate deference

---

18. M. Rosenberg, Judicial Discretion of the Trial Court, Viewed From Above, 22 Syracuse L.Rev. 635, 636–637 (1971) (footnote omitted).

19. When an adjudicator has the primary type, he has decision-making discretion, a wide range of choice as to what he decides, free from the constraints which characteristically attach whenever legal rules enter the decision process. When the law accords primary discretion in the highest degree in a particular area, it says in effect that the court is free to render the

decision it chooses; that decision-constraining rules do not exist here; and that even looser principles or guidelines have not been formulated. In such an area, the court can do no wrong, legally speaking, for there is no officially right or wrong answer. *Ibid.,* at 637.

20. *Ibid.*

21. Napolitano v. Compania Sud Americana de Vapores, 421 F.2d 382, 384 (2d Cir. 1970).

to a determination of the district judge" in an area committed to his discretion.[22] So tested, I do not find the district court's rejection of the alternate trial-controlling or trial-postponing remedies as an exercise of discretion "so unreasonable or so arbitrary as to amount to a prejudicial abuse."

### C.

Counterposed against the incursions into the integrity of a defendant's right to a fair trial is the public interest in court proceedings, in Justice Frankfurter's felicitous expression, "[o]ne of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there. . . . " Maryland v. Baltimore Radio Show, Inc., *supra,* 338 U.S. at 920, 70 S.Ct. at 255. I am persuaded that the public interest here was already satisfied. First, the subject matter of the restraint did not relate to the district court trial in Philadelphia, but to an historical narrative of past separate federal and state indictments in New Jersey. It was not critical to a complete reporting of immediate courtroom events. Second, the subject matter related to indictments, which are merely accusations, not to judicial determinations of guilt. Third, the information had already been disseminated on October 4 and repeated and expanded on October 5. Fourth, because it had already been published twice and related to past events of grand jury actions, the subject matter did not constitute "hot news." Any residual newsworthiness which inhered in these utterances could have been preserved for the short time, the "one more day," requested by Judge Ditter.

What is here is not prior restraint, New Jersey State Lottery Commission v. United States, 491 F.2d 219 (3d Cir. 1974) (in banc), but a ban on the repetition of previously published information for *"one more day,"* until the trial concluded. We are reminded in Kingsley Books, Inc. v. Brown, 354 U.S. 436,

441, 77 S.Ct. 1325, 1328, 1 L.Ed.2d 1469 (1957): "Just as Near v. Minnesota, . . . [283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)] one of the landmark opinions in shaping the constitutional protection of freedom of speech and of the press, left no doubts that 'Liberty of speech, and of the press, is also not an absolute right,' 283 U.S. at 708, 51 S.Ct. at 628, it likewise made clear that 'the protection even as to previous restraint is not absolutely unlimited.' *Id.* [283 U.S.] at 716, 51 S.Ct. at 631. To be sure, the limitation is the exception; it is to be closely confined so as to preclude what may fairly be deemed licensing or censorship." *Kingsley* permitted an injunction *pendente lite* because the New York statutory scheme permitted a final decision on the merits two days after trial which in turn had to be set one day after joinder of issue. This is a time period far in excess of the one day requested by Judge Ditter. Thus we are not presented with the problem met in Grove Press Inc. v. City of Philadelphia, 418 F.2d 82 (3d Cir. 1969), where we found that the Pennsylvania procedural rules governing equity actions did not satisfy the requirement of Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), because the state's procedural rules did not contain time limits guaranteeing a prompt final decision on the merits after the issuance of a preliminary injunction.

### V.

I would affirm the district court, under the procedural posture of this case, because neither at the hearing nor on appeal have appellants urged what I believe to be a critical issue when the countervailing precepts of the Sixth and First Amendments collide—that the draconian act of injunction may issue only if no adequate remedy at law is available.

I am not at all certain that any remedy at law exists to vindicate the Sixth Amendment rights of a defendant which

---

22. Noonan v. Cunard Steamship Co., 375 F.2d 69, 71 (2d Cir. 1967).

are impinged by unfettered expressions of the press. As the moving party in the motion to vacate the silence order, appellants had the burden of demonstrating the existence of an adequate remedy at law. As a corollary it would seem that the movant for a silence order has the burden of establishing the absence of an adequate legal remedy as a prerequisite to obtaining the order.

It has become the recent fashion to resort to money damages for, in Roscoe Pound's phrase, "substituted redress" of, invaded rights. Thus a boundless galaxy of § 1983 cases [23] has appeared in our judicial skies where the infringer has operated under color of state law; and if the infringer is a federal officer, the claimant may enter federal court with credentials furnished by Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

Where, as here, the putative infringer is a private person, the availability of a remedy at law is not free from considerable doubt. To be sure, because it was not raised below, we must await the proper case or controversy to furnish some guidance, but at least it is arguable that a remedy may exist in the federal courts under one of the less familiar Civil Rights Acts, 42 U.S.C. § 1985(3): "If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons . . . of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." A leading commentator argues that due process rights are protected by this section although he admits the existence of authority to the contrary.[24]

Then, too, there is the possibility, also admittedly untested, that an action at law may lie in Pennsylvania courts for an action in damages based on a violation of Art. 1, § 9 of the Constitution of Pennsylvania: "In all criminal prosecutions, the accused [cannot] . . . be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." Commonwealth v. Petrillo, 338 Pa. 65, 12 A.2d 317, 333 (1940), holds that this Pennsylvania constitutional provision guarantees an accused the due process right to a fair trial. I would be more confident of the availability of this remedy if my research indicated that the provisions of the state constitution were self-executing, unlike the federal constitution which requires congressional action to best remedial district court jurisdiction. Cary v. Curtis, 3 How. 236, 11 L.Ed. 576 (1845); Sheldon v. Sill, 8 How. 441, 12 L.Ed. 1147 (1850). Cf., Martin v. Hunter's Lessee, 1 Wheat. 304, 4 L.Ed. 97 (1816). A cursory research discloses no cases affirming or negating a self-executionary status of the Pennsylvania Constitution.

Without the benefit of initial consideration by the trial court, or brief or argument here, I cannot, without more, conclude that an adequate remedy at law exists to have denied Schiavo the benefit of a silence order, injunctive in nature. In any event, I find that appellants had the burden of persuasion on this issue in their motion to vacate the oral silence order. They did not meet their burden.

### VI.

The judicial angle of vision in testing any restraint of speech must encompass the various interests to be protected by the separate components of the Bill of Rights. Justice Frankfurter has reminded us: "The phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test. The duty of closer analysis and critical judgment in applying the thought behind the phrase has thus been authoritatively put by one who brings weighty

23. 42 U.S.C. § 1983, one of the Civil Rights Acts.

24. C. Antieau, Federal Civil Rights Act, § 99, p. 129 (1971).

learning to his support of constitutionally protected liberties: 'What is needed,' writes Professor Paul A. Freund, 'is a pragmatic assessment of its operation in the particular circumstances. The generalization that prior restraint is particularly obnoxious in civil liberties cases must yield to more particularistic analysis.' The Supreme Court and Civil Liberties, 4 Vand.L.Rev. 533, 539." Kingsley Books, Inc. v. Brown, *supra*, 354 U.S. at 441–442, 77 S.Ct. at 1328.

The particularistic analysis ultimately requires a choice between conflicting interests to 'determine' whether a limitation in expression is mandated on the basis of a threat to the defendant's Sixth Amendment right to receive a trial by an impartial jury. We must not be insensitive to the dangers that lurk in any choice, but the high responsibilities of this judicial office require that a choice be made. It does not augur well to postpone this choice, or to pass this burden to another time.

I am persuaded that in this case the scales must be tipped to vindicate the defendant's fundamental right to receive a fair trial at the expense of some limited impairment of First Amendment rights. The procedure followed by the district court here, in the exercise of its inherent powers to "take strong measures to insure that the balance is never weighed against the accused" and to invoke the power enunciated in Branzburg v. Hayes, *supra*, was proper.

I am aware that a certain institutional value is affixed to any decision of this court, but the genius of our jurisprudential tradition is that the parameters of a holding are limited to the factual complex that creates it. Here the facts do not fit the mold of classic prior restraint; it was a restraint upon a repetition of previously disseminated public utterances. The publication was not "hot news." The restraint was upon repetitive, not original, publication. Moreover, the judicial ban was not open-ended; it was restricted to an extremely limited period of time, in the words of the court, "for one more day."

I would conclude that any interest here protected by the First Amendment must be subordinated, under the circumstances of this case, to countervailing interests protected by the Sixth Amendment.

I would affirm the judgment of the district court.