

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-27-2001

# United States v. Scarfo

Precedential or Non-Precedential:

Docket 00-4313

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Scarfo" (2001). *2001 Decisions.* Paper 194.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/194

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 27, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-4313

UNITED STATES OF AMERICA

v.

NICODEMO S. SCARFO

*Donald F. Manno,

     Appellant

*(Pursuant to F.R.A.P. 12(a))

Appeal from the United States District Court
For the District of New Jersey
D.C. No.: 00-cr-00404-1
District Judge: Honorable Nicholas H. Politan

Argued: July 19, 2001

Before: SCIRICA, RENDELL, and ROSENN, Circuit  Judges.

(Filed: August 27, 2001)

       Robert J. Cleary,
        United States Attorney
       George S. Leone, Chief,
        Appeals Division (argued)
       970 Broad Street
       Newark, NJ 07102-2535
        Counsel For Appellee

        Donald F. Manno, Esq. (argued)
        900 Dudley Ave., Suite 250
        Cherry Hill, NJ 08002
         Counsel For Appellant

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents an issue of first impression in this circuit pertaining to a lawyer's right to make extrajudicial statements to the press relating to a former client's pending criminal case. The exchange between the defendant's former lawyer and a member of the press resulted in a newspaper article that raised the District Court's indignation. The Court imposed a gag order against Donald F. Manno, defendant's former counsel; Manno appealed. The primary issue on appeal concerns the First Amendment right of speech. Before reaching that issue, we must consider certain procedural matters concerning the appealability of an oral order, the effect on the record of the District Court's addition to it after a notice of appeal is filed, and the collateral order doctrine. Because we hold that we have jurisdiction over an appealable collateral oral order, and that it was error to issue the gag order, it will be reversed.

I.

A.

On June 21, 2000, a federal Grand Jury in the District of New Jersey issued a sealed indictment charging Nicodemo Scarfo ("Scarfo") and Frank Paolercio with various illegal gambling acts. Donald F. Manno, Esq. ("Manno") made an initial appearance for Scarfo. For reasons not relevant to our decision, the United States moved to disqualify Manno, and the District Court granted the motion.

Subsequently, the Philadelphia Inquirer ("Inquirer")

2

interviewed Manno. On December 4, 2000, over a month after the court disqualified Manno from the Scarfo proceedings, an article appeared in the Inquirer quoting Manno and the government prosecutor. The article concerned a controversial means of surveillance used to acquire evidence against Scarfo.[1] Both Manno and the prosecutor predicted the filing of a pretrial motion contesting the legality of the Government's surveillance technique.[2]

On December 5, 2000, the District Court held a previously scheduled hearing. Citing the Inquirer article, the Court entered an oral order barring "anybody from talking to the press about the motion that I haven't seen and that I don't know anything about." The Court stated that the order applied to Manno, although he no longer represented Scarfo. The order was to last until the Court received the motion and decided it. Manno requested a written order, and the Court promised one. The docket entry for the December 5, 2000, hearing states, inter alia, "ORDERED THAT A GAG ORDER REMAIN IN EFFECT." On December 8, 2000 Manno filed a notice of appeal.

On January 10, 2001, the District Court held another hearing. Manno appeared, along with his replacement, Vincent Scoca, Esq., and the government counsel. Manno and the District Court engaged in a lengthy discussion after which the District Court orally clarified and affirmed its December 5 oral order. The District Court again promised a written order.

On February 9, 2001, Manno filed his brief on appeal with this Court. On March 12, 2001, more than two months after the hearing, the District Court signed an

_____

1. The Government suspected that Scarfo used a certain computer to facilitate his illegal gambling activities. After securing a search warrant,
the Government installed a difficult-to-detect hardware device on Scarfo's computer. The device purportedly allowed the FBI to reproduce every stroke entered on Scarfo's computer, and later to use that information to read the contents of the computer files.

2. We learned at oral argument that Scarfo's new counsel filed a motion on this issue earlier this year. The Government has responded, and the parties anticipate adjudication sometime in August or September, 2001.

3

order formalizing its December 5, 2000, and January 10, 2001, oral orders, and making findings of fact. On May 14, 2001, Manno filed a reply brief in response to the Government's brief, discussing, in part, the District Court's written order.

B.

1. The Inquirer Article

On December 4, 2000, a Philadelphia Inquirer article reported the Government's use of a "keystroke-logging device" on Scarfo's computer. The article stated that the device "allowed the FBI to reproduce every stroke[Scarfo] entered on a computer on which gambling records allegedly were stored." The article predicted that Scarfo's legal challenge of the keystroke-logging device "may create new law."

The article also quoted Manno as stating that "[a]nything [Scarfo] typed on that keyboard -- a letter to his lawyer, personal or medical records, legitimate business records -- they got it all. . . . That's scary. It's dangerous." The article continued:

> Manno contends that federal investigators improperly used a search warrant as authorization to install a keystroke recorder on Scarfo's business computer in the spring of 1999. By monitoring the keyboard during May and June, investigators were able to determine the code and password Scarfo used to access an encrypted program which, authorities suspected, he was storing gambling and loan-sharking records.
>
> Manno said that he was preparing a motion challenging the legality of the surveillance when he was disqualified from the case in October. Manno was barred because in the past he represented a client who expected to testify for the government against Scarfo.
>
> He said he expected the challenge to the surveillance will be raise by whomever Scarfo hires to replace him.
>
> "I don't think there is any case law on this issue, and I hope the fact that it's a so-called organized crime

4

investigation doesn't detract from the fundamental and overriding concern here, which is an individual's right to privacy," Manno said last week.

The article concluded:

Manno would not discuss what his client was storing on the [computer] but said Scarfo was using software known as PGP. "It stands for Pretty Good Privacy," the lawyer said with a chuckle.

The article also quoted the prosecuting attorney:

"I can't talk about any of it," he said, "but I think it's correct to say this is [a] cutting-edge [legal issue]."

2. December 5, 2000 Hearing

On December 5, 2000, the District Court held a hearing originally scheduled to ensure that Scarfo found a replacement lawyer after Manno's October 27, 2000, disqualification. The hearing quickly re-focused on the Judge's reaction to reading the December 4, 2000, Inquirer article. The Judge stated, "I'm barring anybody from talking to the press about the motion that I haven't seen and that I don't know anything about." He continued, "Mr. Manno, you are under a specific obligation and injunction from this Court not to speak to the press about this case at all. Period. And if you have an objection to my motion, you have a right to go to the Third Circuit Court of Appeals. If you want to do it, be my guest."

The Judge, apparently perturbed at not having seen or decided any motion papers before their substance appeared in the press, proceeded to flesh out the order. He stated:

The Court: No matter who you talk to, you tell them they're not to talk to the press about this case. Appx. 13.

The Court: After I decide whatever is going to be decided -- I don't know what it is -- the, of course, that is a different rule. Right now, we're not going to try this case in the Philadelphia Inquirer or the Atlantic City Journal or the Newark Star-Ledger or any other newspaper. Id.

5

Manno: Judge, I assume that your Honor will be so kind as to put into writing the injunction against me?

The Court: If you would like it.

Manno: I would appreciate if you would put that into writing.

The Court: It will be my pleasure. Id. at 17.

The Court: You're a citizen, but you're subject to this Court. You know, you can't make comments about a case that is pending in front of me at this point. .. . I don't want people to tell me I got a cutting-edge cyberspace, whatever, when I haven't seen a piece of paper that reflects anything about this case. When I get the motion and I decide the motion, if you want to speak, you're a citizen, you're entitled to speak. You're entitled to say the judge is wrong, right, praise me or damn me. Doesn't matter. Id. at 18.

The Court: I might be influenced by [an argument in the newspaper] if it was a good argument . . . . What I object to, so that you know, is extrajudicial comments about a matter which is not even pending before this Court yet. Id. at 19.

The Court: I'm not suggesting people can't look at the public records. They're entitled to [that]. I'm not sealing the record in this case. I'm merely saying until this Court has had an opportunity to see the motions, to see the response by the government and to hear oral argument, I don't want it commented upon. That's all.

Manno: I understand your order. Id. at 20-21.

3. January 10, 2001 Hearing

After the December 10 hearing, the Government proposed a written order embodying the Court's oral order. The District Court rejected the order as inaccurate. See Supp. Appx. 32. On January 10, 2001, the District Court held a hearing concerning Scarfo's retention of new counsel and, again, the Court spent much of the hearing discussing the injunction with Manno:

The Court: It was brought to my attention that there was an article in the Philadelphia paper . . . in which

6

you gave an interview . . . in which you talked about the cyber space, or something, and this was ground-breaking material dealing with the government's intrusion upon defendant's rights, et cetera. . . . I was unaware of that issue, number one; and number two, had not ruled upon that issue, and had not heard argument upon that issue, and had not read one shred of piece of paper on that. . . .

I was upset because, in my judgment, you were trying that motion in front of the press before you gave this Court an opportunity even to see the matter and to me that is what I restrained. Id. at 34.

The Court: I did not put a gag order on the case . .. I was going to stop [discussions in the press] until I heard the motion. Id. at 34.

The Court: I haven't modified [the oral order of 12/6/00] one iota. If I don't have the right to at least retain some decorum in the presentation of matters during the course of the criminal case, without impinging upon the First Amendment rights of the people, . . . let the Third Circuit Court of Appeals tell you that. I think I have an inherent right to control proceedings before me. . . . I felt that your actions in speaking to the press was totally inappropriate . . . . Id. at 37.

The Court: When you come up in my land, we do things orderly, we do things nicely, and civilly, and we don't try cases in the press. Id.

Manno: [I]t is beyond anything I could imagine that that article in the Philadelphia newspaper affected the decorum or the dignity in this court and certainly none of my comments were meant in any way, shape, or form . . . to compromise the integrity and dignity of this Court. Id. at 37-38.

The Court: I'm not talking about affecting the jury.. . . . You folks are off in left field when you talk about [affecting the jury]. I was concerned whether we talk about how I felt -- orderly presentation of significant and important arguments by counsel. . . And if you

7

want to say you're affecting someone, or trying to affect someone, you're trying to affect the judiciary. . . . I don't want to read about something that hasn't even occurred in my court to be placed in a newspaper by one of the counsel who was then counsel for -- who was then counsel for the defendant in the case. Id. at 38-39.

Manno: I cannot see how a newspaper article in the Philadelphia Inquirer can affect this Court, that this Court could not effectively disregard this article .. . .

The Court: Your knowledge of this [case] did not come to you because you were an ordinary citizen on the street. The Philadelphia Inquirer did not come to you because they wanted to get an expert opinion. They came to you because you were Mr. Scarfo's lawyer and they thought you were Mr. Scarfo's lawyer until you said I had disqualified you. Your knowledge does not emanate from a source outside of this proceeding, it comes specifically because of this proceeding. . . . Id. at 41.

Manno: Quite frankly, Judge, what relevance does it have, the source of my information?

The Court: It has a lot of relevance. You're trying to pretend to be a common person. In fact, your knowledge comes specifically from your involvement in this case . . . . Don't clothe yourself with the white cloak of being someone in the street who is interviewed by the Philadelphia Inquirer. . . . You got to argue [Scarfo's future motion] in the press. Id. at 42.

4. March 12, 2001 Written Order

During the January 10 hearing, the Court offered Manno an opportunity to submit a form of order, but Manno refused. Instead, the Government proposed an order, which the Court signed and entered on March 12, 2001. 3 It stated that the matter came before the Court sua sponte, and was based "on the record made during the proceeding in this

_____

3. By this time, Manno had already submitted his appellate brief to this Court.

8

matter on December 5, 2000, and January 10, 2001." The order proceeded to find, in relevant part, that: 1) Manno had discussed the merits of an anticipated motion in the case concerning electronic or computer surveillance techniques; 2) without a court order, Manno would likely make such statements to the press in the future, and those statements would be "received as authoritative" given his previous representation of Scarfo; 3) a local Criminal Rule prohibits a lawyer representing a party in a criminal matter from making an extrajudicial statement if the lawyer knows or should reasonably know that it will have a substantial likelihood of causing material prejudice to an adjudicative proceeding; 4) there is a substantial likelihood of future statements, and future statements to the press regarding legal issues prior to adjudication will "materially prejudice the Court's ability to fairly and efficiently determine the anticipated pre-trial motion and any legal issues not yet presented to and adjudicated by the Court"; 5) other curative measures concerning empaneling an impartial jury would likely be ineffective in ensuring that such statements would not risk harm to the judicial process; 6) this order is the least restrictive means available to prevent the threatened danger; and 7) the order lasts no longer than necessary to prevent the threatened danger, and is narrowly drawn to prohibit only those statements having a meaningful likelihood of materially impairing the Court's ability to fairly and efficiently determine the anticipated pre-trial motion "and any legal issues not yet presented to and adjudicated by the Court, and to conduct a fair trial."

The Court ordered that:

> [N]o lawyer representing or who has represented a party in this criminal matter could make any extrajudicial statement to the press regarding legal issues which may be raised concerning electronic or computer surveillance techniques, which a reasonable person would expect to be disseminated by means of public communication, which he knows or reasonably should know will have a substantial likelihood of causing material prejudice to the determination of the anticipated or filed pre-trial motion, or the conducting of a fair trial in the case.

9

The order was to remain in effect until "any such motion raising these legal issues is adjudicated by the court."

II.

In light of the oral order, we first must determine whether we have jurisdiction over the appeal, and if so, what constitutes the record. We engage in this threshold inquiry sua sponte, as the parties did not brief any of the jurisdictional issues. At oral argument, counsel for both sides argued in favor of our exercising jurisdiction, but a more searching inquiry is necessary because consent does not confer appellate jurisdiction.4

A.

The District Court expressed doubt about whether its December 6, 2000, oral order was appealable. See Supp. Appx. 31 ("first of all, I don't think the notice of appeal is effective; there's no written order.") A district court's order "is ordinarily considered final and appealable under S 1291 only if it `ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996) (quoting Catlin v. United States, 324 U.S. 229, 233 (1945)). Under the collateral order doctrine, however, an otherwise non-final order can be appealed if it finally and conclusively determines the disputed question, resolves an important issue separate from the underlying merits, and is effectively unreviewable after final judgment. See In re Tutu Wells Contam. Litig., 120 F.3d 368, 378 (3d Cir. 1997) (citing Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)).

In this case, the District Court finally and conclusively entered a gag order against Manno. The gag order was separate from the underlying merits of Scarfo's guilt or innocence. The order concerned Manno's First Amendment rights, not Scarfo's or anyone else's Constitutional rights.

_____

4. There being no "unyielding jurisdictional hierarchy," Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577 (1999), we approach these preliminary and jurisdictional inquiries in no particular order.

10

See United States v. Brown, 218 F.3d 415, 422 (5th Cir. 2000) (defendant state official's appeal of gag order was collateral to the criminal action pending against him). Although we could review a gag order after entry of a final judgment, doing so could be at considerable expense of the silenced party's constitutional rights. Moreover, in this instance, the party is no longer Scarfo's attorney in the underlying criminal proceedings. Hence, the collateral order doctrine confers appellate jurisdiction over Manno's appeal.

B.

Manno filed his notice of appeal on December 8, 2000. The Government argues that the notice of appeal was filed prematurely under Fed. R. App. Proc. 4(a)(2), and additionally because the District Court stated on December 6 that a written order would issue. The oral order possessed judicial force and effect;[5] it had teeth and had Manno violated it, he might have been subject to punishment even if the order had not yet been reduced to writing. That order's oral status does not alter its appealability as a collateral order. Manno did not file his notice of appeal prematurely; the notice of appeal was filed timely and it effected a closure of the District Court's jurisdiction over the gag order issue. See Sheet Metal Workers' Int'l Assn. Local 19M v. Herre Bros., Inc. , 198 F.3d 391, 393 (3d Cir. 1999) ("The filing of a notice of appeal confers jurisdiction on the Court of Appeals and divests the

_____

5. In United States v. Schiavo, 504 F.2d 1, 4–5 (1974), the District Court entered an oral order preventing the press from reporting on a trial. We found it unnecessary to resolve whether the oral order was an appealable order because the District Court eventually issued a written order upon which we decided the appeal. We noted, however, that "[w]here a district court enters . . . an order which is immediately appealable as a final decision in a collateral matter, and where such order binds non-parties for a continuing period of time, the order should be reduced to written form, stating specifically the terms of the order and the reasons therefor, and entered on the district court docket." Id. at 7. We add that the reduction to written form should be done with reasonable promptness.

We also read Schiavo as implying that an oral order enjoining conduct in a collateral matter may be appealable.

11

district court of its control over those aspects of the case involved in the appeal.") (citations omitted). 6

Fed. R. App. Proc. 4(a)(2) states that "[a] notice of appeal filed after the court announces a decision or order-- but before the entry of the judgment or order -- is treated as filed on the date of and after the entry." Rule 4(a)(2) does not apply here because this rule concerns primarily whether a notice of appeal was filed in or out of time. See, e.g., Firstier Mortg. Co. v. Investors Mortg. Ins. Co., 498 U.S. 269 (1991); Lazy Oil Co. v. Witco Corp., 166 F.3d 581 (3d Cir. 1999); Hindes v. F.D.I.C., 137 F.3d 148 (3d Cir. 1998); Reo v. United States Postal Svc., 98 F.3d 73 (3d Cir. 1996). In this case, the timeliness of the appeal is not at issue. Unlike a judgment,7 if all other jurisdictional requirements are met, the order's existence in oral form will not by itself prevent it from being appealable. The District Court should have moved promptly in reducing its order to writing. See Schiavo, 504 F.2d at 4-5.

C.

The parties dispute the contents of the record on review. Manno argues that the record was closed after December 5, 2000, though he conceded at oral argument that he thought the March 12, 2001, written order should be reversed. The Government argues that the written order is

_____

6. In United States v. Samango, 607 F.2d 877, 880 (9th Cir. 1979), the Court held that the District Court's oral order was not the starting point for running of the statute of limitations where the Court stated its intent to issue a written order at a later date. The Court of Appeals reasoned that if a District Court contemplates issuing a formal judgment, then the time for appeal does not begin to run until that formal judgment is entered. In this case, we are not concerned with the timeliness of a notice of appeal, but rather with the cut-off date for the District Court's power to enter orders, oral or written, regarding Manno's speech to the press. Because the District Court's December 6 oral order had judicial force and effect, and subjected Manno to the possibility of contempt for violation. It was appealable collaterally despite the Court's stated intention to put it in writing.

7. See Fed. R. Civ. Proc. 58 ("Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth . . . .")

on appeal, so the record includes the transcripts of the two hearings, and all of the ancillary filings in the District Court, including a copy of the December 4, 2000, Inquirer article.

District Courts are allowed to supplement the record with a written opinion or amplification of a prior written or oral recorded ruling. See 3d Cir. LAR 3.1 (1988). Such a writing must be filed within 15 days of the District Court's receipt of the notice of appeal. See id. In this case, the notice of appeal was filed on December 8, 2000. The January 10 hearing transcript and the March 12 written order do not meet the 15-day deadline of our rule.

When considering litigation transcripts or memoranda filed by the District Court after the LAR 3.1 15-day window has expired, "we will look to the nature of the supplemental memorandum and whether its consideration would prejudice the defendant." United States v. Bennett, 161 F.3d 171, 186 (3d Cir. 1998). LAR 3.1 "was designed to provide more flexibility . . . [it was] not intended to inhibit or discourage District Courts from preparing opinions as they presently do." Id. In Bennett, this court considered a Sentencing Memorandum entered by the District Court after briefing in the Court of Appeals was complete. 161 F.3d 171, 186. We reasoned that the untimely Sentencing Memorandum was an amplification of the District Court's sentencing decisions, and would not prejudice the defendant. See id. In United States v. Pelullo, 14 F.3d 881, 907 (3d Cir. 1994), we observed that "the preferred practice is for the district court to file any memorandum opinion before or concurrent with its final judgment. Exigent circumstances may justify a late memorandum, but delayed filing may raise suspicions of partiality." The Pelullo court re-emphasized that LAR 3.1 is not an iron-clad rule, and inferred that courts would evaluate whether to consider a District Court's post-appeal submission on a case-by-case basis.

In this case, the District Court uttered its last word in March 2000. Although this occurred after Manno had filed his brief on appeal, it occurred two months before Manno filed his reply brief. Manno was free to address the District Court's January transcript and March written order in his

reply brief; in fact, he did. Manno sustained no prejudice. We consider the District Court's January transcript and March written order as supplementing its reasons for entering the December 6, 2000, gag order, as well as defining the exact parameters of the gag order. 8 We do not consider the District Court's post-December 8, 2000, actions concerning the gag order as an additional exercise of jurisdiction over the gag order.

D.

Our jurisdiction is limited constitutionally to live cases and controversies. See U.S. Const. art. III,S 2. The District Court's order expires after the Court decides the pre-trial motions; at that point, the issue on appeal will be moot.

We retain jurisdiction because this case involves an issue "capable of repetition, yet evading review." See United States v. Antar, 38 F.3d 1348, 1356 (3d Cir. 1994) (citing Southern Pacific Term. Co. v. Interstate Comm. Comm'n, 219 U.S. 498, 515 (1911)). The capable of repetition-evading review doctrine has two requirements: 1) the challenged action must have been too short in duration to be fully litigated prior to its cessation or expiration; and 2) there must have been a reasonable likelihood that the same complaining party would be subjected to the same action again. See id. (citing Weinstein v. Bradford, 423 U.S. 147, 149 (1975)).

A gag order lasting until a pre-trial motion pertaining to the offensive subject is filed and decided, is too short in duration to be litigated prior to its expiration. In this case, the gag order is collateral to the merits of the criminal action, so there is no reason for the criminal action to wait for a decision on this appeal. By the time Manno could obtain an appellate decision on the merits, the gag order in all probability would have expired. Without review in this case's current posture, there is a virtual certainty that a

_____

8. This outcome is the same as if we had held that Manno's notice of appeal was filed prematurely under Fed. R. App. Proc. 4(a)(2). Either way, the record would include both hearing transcripts and the March 12, 2001, written order, as well as a copy of the Inquirer article.

14

party like Manno would be subjected to the same unreviewable action in the future. Accordingly, we retain jurisdiction to decide the appeal on its merits.

III.

The rights protected by the First Amendment to the United States Constitution frequently are in tension with other constitutional rights. The task of resolving that tension without unduly burdening a competing right has unceasingly occupied all levels of the federal courts. We return to this familiar but no less difficult setting.

A.

"It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." New York Times Co. v. Sullivan , 376 U.S. 254, 269 (1963) (citing Bridges v. California, 314 U.S. 252, 270 (1941). At the same time, "a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity." Gannett Co. v. DePasquale, 443 U.S. 368, 378 (1978). In Pennekamp v. Florida, Justice Frankfurter discussed the tension we find in this appeal:

> Formulas embodying vague and uncritical generalizations offer tempting opportunities to evade the need for continuous thought. But so long as men want freedom they resist this temptation. Such formulas are most beguiling and most mischievous when contending claims are those not of right and wrong but of two rights, each highly important to the well-being of society.

328 U.S. 331, 351 (1945) (Frankfurter, J. concurring). The Supreme Court "has held that the Constitution[does] not allow absolute freedom of expression —— a freedom unrestricted by the duty to respect others needs fulfillment of which makes for the dignity and security of man." Id. (citing Schenck v. United States, 249 U.S. 47 (1918). Justice Holmes's famous "clear and present danger" test is the penultimate embodiment in First Amendment law of the principle that freedom of speech is critically important, but

15

that "its exercise must be compatible with the preservation of other freedoms essential to a democracy and guaranteed by our Constitution." Pennekamp, 328 U.S. at 353 (Frankfurter, J. concurring).

To have full force and effect, the First Amendment may not be trimmed just because of appealing circumstances; the regulation of speech-connected activities must be carefully restricted. See Tinker v. Des Moines Sch. Dist., 393 U.S. 503, 513 (1968). "The privilege of `free speech', like other privileges, is not absolute; it has its seasons; a democratic society has an acute interest in its protection and cannot indeed live without it; but it is an interest measured by its purpose." NLRB v. Federbush Co., 121 F.2d 954, 957 (2d Cir. 1941) (Hand, J.).

In many cases, the Supreme Court has provided guidance on balancing competing rights in the First Amendment context. Specifically, in Gentile v. State Bar of Nevada, 501 U.S. 1030 (1990), the Court examined the competing interests between lawyers in a pending case wishing to speak to the media about that case, and a district court attempting fairly to adjudicate that action. In this case, we face a similar tension between a disqualified attorney's right to speak to the media about a pending case, and a trial court's constitutional duty to try a case fairly without the negative impact of unfavorable pretrial publicity.

B.

We exercise plenary review over the legal standards applied in the District Court. See United States v. Antar, 38 F.3d 1348, 1356-57 (3d Cir. 1994). In the First Amendment context, reviewing courts have a duty to engage in a searching, independent factual review of the full record. See Antar, 38 F.3d at 1357 (citing New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)); Fabulous Assoc., Inc. v. Pennsylvania Public Utility Com'n, 896 F.2d 780, 784 (3d Cir. 1990) (noting the exacting standard of review traditionally applied to state actions impacting on rights protected by the First Amendment). The Supreme Court has emphasized an appellate court's obligation independently to

16

examine the whole record to ensure "that the judgment does not constitute a forbidden intrusion on the field of free expression." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 284- 286 (1964); NAACP v. Claiborne Hardware, Co., 458 U.S. 886, 933-934 (1982); Greenbelt Cooperative Pub. Assn. v. Bresler, 398 U.S. 6, 11 (1970); St. Amant v. Thompson, 390 U.S. 727, 732- 733 (1968)).

No cases are cited to us in this circuit or in the Supreme Court discussing the precise issue on appeal, and our own research has not uncovered any. Some cases concern gag orders on lawyers representing defendants, others discuss gag orders on defendants themselves, and others concern restrictions on the press. However, we know of no case which deals with the constitutionality of an order gagging a criminal defendant's former attorney. Manno argues that following his disqualification, he was no longer an attorney in the case; instead, he was a member of the public at large, free to make statements to the press. The Government responds that Manno was still a lawyer obliged under legal canons to avoid making Scarfo's case in the press.

The District Court stated it had inherent power to control the proceedings before it by precluding a disqualified attorney from making comments to the press on an important issue before a court had adjudicated it. Among the reasons the Court put forth in support of the gag order were: 1) to maintain decorum; 2) to maintain fairness; 3) to avoid prejudicing the Court before it made decisions; and 4) to allow for the orderly, "nice," and civil flow of proceedings. The Court at one point stated that it was not concerned about tainting the potential jury pool, but later invoked the risk of jury pool tampering in support of the order.

A gag order like the one issued against Manno is a restraint on speech that raises rights under the First Amendment of the United States Constitution. The Supreme Court and Courts of Appeal have announced varying standards to review gag orders depending on who or what is being gagged. The press, the public, criminal defendants, and attorneys have received separate analytical

17

treatment by the Supreme Court concerning restrictions on speech. See, e.g., Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984) ("[O]n several occasions this Court has approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant."); Gannett Co., Inc. v. DePasquale , 443 U.S. 368 (1979) (under certain circumstances, neither the public nor the press has an independent constitutional right to insist on access to a pretrial suppression hearing); Branzburg v. Hayes, 408 U.S. 665 (1972) (concerning a reporter's claimed privilege from being compelled to disclose names of confidential sources); United States v. Brown , 218 F.3d 415 (5th Cir. 2000) (appeal by defendant politician contesting validity of gag order); United States v. Ford , 830 F.2d 596, 598 (6th Cir. 1987) (same).

As a rule, "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press." Gentile v. State Bar of Nevada, 501 U.S. 1030, 1074 (1990). In Gentile, the Court addressed a lawyer's appeal from a Nevada Bar Disciplinary Board's finding that he violated a rule prohibiting lawyers from making extrajudicial statements to the press when they knew or reasonably should have known the statements would have a substantial likelihood of materially prejudicing an adjudicative proceeding. Gentile had held a press conference the day after his client was indicted on criminal charges. The Supreme Court framed the issue as "whether a lawyer who represents a defendant involved with the criminal justice system may insist on the same standard [as applied to a prior restraint on the press-- clear and present danger,] before he is disciplined for public pronouncements about the case, or whether the state may penalize that sort of speech upon a lesser showing." Gentile, 501 U.S. at 1071.

The Gentile Court dealt with a slightly different situation than we have before us. It punished an attorney under a state rule for having made comments to the press about his client's innocence in a pending case. In our case, The Court prohibited Manno, a disqualified attorney, from making any future statements to the press. Gentile expressed "no

18

opinion on the constitutionality of a rule regulating the statements of a lawyer who is not participating in the pending case about which the statements are made." Gentile, 501 U.S. at 1072 n. 5. However, the Court discussed thoroughly the standards used in restricting the speech of attorneys in general, and as discussed below, that is the appropriate standard in this case. That Manno no longer represented Scarfo when the District Court enjoined him is a slight deviation from Gentile , and does not distract from our application of the Supreme Court's reasoning.

A lawyer's right to free speech in a pending case may be circumscribed in the courtroom and is limited outside the courtroom as well. See Gentile, 501 U.S. at 1073. A lawyer admitted to the bar of a court must expect the disciplinary limitations of his profession. Lawyers should not be surprised when they learn that their chosen professional status, as in the cases of judges, restricts their conduct and speech at times.

Gentile held that the "substantial likelihood of material prejudice" standard is constitutionally permissible to balance the attorney's interest in free speech against the state's interest in fair judicial determinations. Extrajudicial statements by attorneys pose a threat to a pending proceeding's fairness because attorneys have access to information through discovery and client communication, and because their statements are likely to be received as especially authoritative. The "substantial likelihood of material prejudice" standard fairly balances the integrity of the justice system with attorneys' constitutional rights. Under Gentile, we examine the record to determine whether the District Court's injunction in this case prevented a substantial likelihood of material prejudice to the judicial proceeding.9 Any limitation on the attorney's speech must

_____

9. In United States v. Brown, 218 F.3d 415 (5th Cir. 2000), the Court applied Gentile to a District Court order prohibiting attorneys, parties, and witnesses from discussing an ongoing criminal action with any public communications media. Importantly, the Court of Appeals agreed with the District Court's finding that the possible impact of extrajudicial
statements included the creation of a "carnival atmosphere," and tainting of the un-sequestered jury. This finding, supported by the record, was pivotal in establishing the substantial likelihood of prejudice required by
Gentile for a gag order to stand. These are the types of findings absent in this case.

be narrow and necessary, carefully aimed at comments likely to influence the trial or judicial determination. See Gentile, 501 U.S. at 1075.

Under the facts of this case, we also decide whether a slightly more compelling reason is required for a District Court to quash the speech of an attorney who no longer represents the criminal defendant in the underlying action. Manno portrays himself as an everyday citizen following his disqualification, but that is plainly not so. The District Court perceptively found that Manno was longtime counsel to Scarfo and was known by many, including the media, as having close ties with Scarfo. Manno was the beneficiary of extensive client communication, and his statements were received by the press as especially authoritative. The press presumably sought out Manno, even though he was disqualified, because they presumed that he had information of the sort that only a retained lawyer would know. See Supp. Appx. 39 ("Manno: The Philadelphia Inquirer came to me, they asked me questions.")

Manno was, for all intents and purposes, in the same position as the attorney referred to in the Gentile case -- an insider privy to facts, and a public status removing him from the leagues of common observers or uninvolved attorneys. He was not merely a lawyer with a passing interest in the case. Even following his disqualification, Manno's ties to Scarfo were much more significant than that of a common court observer and member of the public. Gentile pertains to gag orders on trial participants; Manno, no longer a trial participant, still retained the raiment and appearance of one and, therefore, was in a position to still materially prejudice the pending proceedings before the Court. Therefore, it is reasonable to apply the"substantial likelihood of material prejudice" standard announced in Gentile to this case. Cf. United States v. Brown, 218 F.3d 415, 426 (5th Cir. 2000) (describing the Gentile opinion as approving Nevada's substantial likelihood standard to "attorneys," and not differentiating between a current attorney for a party or the former attorney of a party).

The "evils" against which a gag order may appropriately apply are those generally associated with risk of prejudice to the jury pool. See Gentile, 501 U.S. at 1075. The

20

Supreme Court is also concerned with any other form of prejudice to the actual outcome of a trial. See id. Preventing a "carnival atmosphere" in a high profile case is also a legitimate reason to gag an attorney. See Brown , 218 F.3d at 429; see also Sheppard v. Maxwell, 384 U.S. 333 (1966).

The Government strenuously defends a New Jersey local rule prohibiting extrajudicial comments, and a New Jersey ethical rule doing the same. The District Court relied on both as a basis for its order.10 However, the District Court's injunction must stand or fall on its own terms in the factual setting described in the record. We do not perceive credible findings of any risk of material prejudice, much less a substantial likelihood of material prejudice. It is difficult to discern a reasonable source of prejudice in this case. There was little, if any, prejudice to the jury pool because Manno's comments, and the gag order itself, pertained only to an issue of admissibility of evidence -- a determination made by the judge, not a jury. The Court's decision on admissibility of the keystroke logging device evidence, even if reported in the press, would at most alert citizens to the existence of the case, but not to any facts pertaining to guilt or innocence as in Gentile . The District Court apparently agreed when on January 10, 2001, it stated, "I'm not talking about affecting the jury. . . . You folks are off in left field when you talk about[affecting the jury]. I was concerned whether we talk about how I felt -- orderly presentation of significant and important arguments by counsel . . ."

The District Court's primary concern was the risk of prejudice to it in deciding the legal issues not yet before it. See Supp. Appx. 56 (3/12/01 order); Appx. 19 (12/5/00 transcript). But there was no risk of prejudice to the Judge because judges are experts at placing aside their personal biases and prejudices, however obtained, before making reasoned decisions. Judges are experts at closing their eyes and ears to extraneous or irrelevant matters and focusing only on the relevant in the proceedings before them. The

_____

10. These rules are not directly at issue in this appeal, and we express no opinion concerning them except as to the result of their application in this case.

21

District Court did not articulate any specific or general prejudice it would suffer, and we can see none. The closest the Court came to identifying prejudice was its statement that "I was concerned whether we talk about how I felt -- orderly presentation of significant and important arguments by counsel." The District Judge appears to have been upset about reading of a matter pertaining to a case before him in the newspaper before hearing about it in his courtroom. See Supp. Appx. 34 ("I was upset because, in my judgment, you were trying the motion in front of the press . .. .") His concern does not rise to any measurable level of prejudice. An perturbed judge is not necessarily a prejudiced judge especially when, as in this case, he is an experienced judge.

A fair and impartial presentation of the case would not be disrupted or materially prejudiced by Manno's pretrial extrajudicial statement to the press. The statement may have been imbalanced or even irritating because of the timing and content, but not materially prejudicial. If the District Judge had some undisclosed reason for suffering prejudice from the newspaper article, his proper course of action was recusal, not a prior restraint on all of Manno's speech relating to this case.

We always are mindful of the importance of an orderly and fair trial, especially one in which the liberty of an individual and important interests of the public are at stake. However, we are also concerned with the longstanding value and importance of the protection of First Amendment rights. Public awareness and criticism have great importance, especially where, as here, they concern alleged governmental investigatory abuse. See Gentile, 501 U.S. at 1035. Without evidence that Manno's statements to the press jeopardized the fairness of the trial or in any way materially impaired or prejudiced the judicial power of the court, we can see no valid reason to interdict a lawyer's First Amendment right of speech, even of one disqualified in the case.

IV.

In summary, aside from informing the public about an important legal issue about to be raised before the court,

22

Manno's comments on an interesting legal issue did not pose a threat to the fairness of the trial or to the jury pool. Nor did the District Court identify a risk of a carnival-type atmosphere in the case, although organized crime cases often draw massive public interest. See, e.g. , United States v. Cutler, 58 F.3d 825 (2d Cir. 1995). There having been no identifiable prejudice or risk of prejudice, the gag order was erroneous. The order of the District Court will be reversed. Costs will be taxed against the appellee.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

23